Argued April 15, affirmed May 20, 1974

IN THE MATTER OF THE ADOPTION OF BABY ———,
A MINOR.

H. ET UX (No. 4622), *Appellants, v.* CHILDREN'S
SERVICES DIVISION, *Respondent.*

IN THE MATTER OF BABY ———, aka ———, A CHILD.

CHILDREN'S SERVICES DIVISION, *Respondent,*
*v.* H. ET UX (No. 73-186), *Appellants.*

522 P2d 225

*Paul D. Clayton,* Eugene, argued the cause for appellants. With him on the briefs were Luvaas, Cobb, Richards & Fraser, and Douglas L. McCool, Eugene.

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Eric L. Larsen, Thomas Hoyt,* and Butler, Husk & Gleaves, Eugene, filed a letter for child.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Dr. ———, a physician, and his wife appeal from orders of the court denying their petition to adopt baby ——— and making the same child a ward

of the juvenile court and committing baby to Children's Services Division. Hereafter, the adoption petitioners will be referred to as wife and husband respectively, and Children's Services Division will be referred to as CSD.

The baby was born February 14, 1973 and its unwed mother consented to its adoption by petitioners the next day. Petitioners immediately took the child to their home. They filed for adoption on February 20, 1973. A different petition alleging that the adoptive petitioners had subjected the same baby to "cruelty and unexplained physical injury * * *" dated May 11, 1973 was filed by a CSD caseworker in the juvenile court, a department of the circuit court. On the same day an order was entered in that court and case requiring the baby to be taken into custody and placed in appropriate shelter care. On May 18 a short hearing was held and an order was entered returning the child to the care of petitioners, pending the upcoming trial, on the representation that some other responsible person would be at all times with wife and baby when husband was not present.

On June 20 and 22, 1973 orders were entered respectively in the adoption and juvenile court cases consolidating them for trial pursuant to ORS 419.559. The court also appointed counsel for the baby. The consolidated trial was conducted on several days over a period of about two months, and on September 5, 1973 the court entered its orders finding that wife had subjected baby to cruelty and physical injury and had failed to provide the baby with the care, guidance and protection necessary for its physical well-being. The order in the juvenile court case found the baby to be within the jurisdiction of the court and com-

mitted it to CSD for foster-home placement forthwith. The order in the adoption proceeding found that petitioners are not sufficiently able to bring up the child and to furnish suitable nurture and care. The adoption was denied and the court also ordered that no stay or delay in the orders would be allowed.

The orders were appealed to this court and, after a short temporary stay in effectiveness of the orders until this court could consider the matter, a further stay was refused. Petitioners then sought a mandate from the Supreme Court to require this court to enter a stay but that too was refused.

The petitioners' assignments of error are: The court erred (1) in failing to strike and in considering as evidence a police report; (2) in considering extrajudicial information; (3) in consolidating the adoption case with the juvenile proceeding; (4) in finding there is juvenile court jurisdiction; (5) in findings on petitioners' abilities as adoptive parents; and (6) in findings on the propriety of the adoption and in denying the petition for adoption.

The record evidence discloses that husband at the time of the adoption petition was 57 years old, divorced from his first wife and the father of two grown children. Wife was 31 years old and had not previously been married. Husband had had a vasectomy and after his new marriage sought unsuccessfully to reverse it.

Petitioners sought to adopt a child and found baby through contact with another physician. The opportunity to take the baby came suddenly and interrupted vacation plans which petitioners had made. Wife had only two or three days to prepare for taking

the baby. Husband was busy with his medical practice. Wife had help from a lady with her household tasks for about one month of the first two-and-one-half months she had the baby.

Wife quickly became frustrated with the needs of the baby, combined with other demands upon her time which involved doing some office work for her husband and some tutoring which she had previously undertaken. This frustration resulted in several spankings described as "tappings" upon baby's bottom through diapers and some minor "shakings" of the baby, starting when the baby was about one month old. Wife was alarmed at her own conduct and contacted a physician friend who suggested she see a group therapist who had been working with that physician. Consultation with the therapist resulted in his request for her to give him information about her dreams. He expressed to wife the thought that she was covering up great anger.

The day after her second therapy session, May 2, 1973, wife again struck the baby, who was two-and-one-half months old. Her testimony in this regard was:

"Q. And you hit her with your right hand?
"A. Yes.

"Q. The medical reports—the adoption report which was the supplemental adoption report indicates that after the pediatrician examined her he observed some contusions on the right cheek and below the right eye.
"A. Yes.

"Q. Could you explain that to me, if you hit her with the right hand and she was facing you as you explained that to me?
"A. Yes, I can. My hand went like that (indicating).

"Q. Oh, you backhanded her?

"A. The back of my hand, yes."

After this episode wife became frightened and called the therapist who got both wife and husband together with him. The therapist insisted upon someone else being in the home. The therapist reported the incident in such a way that a police investigation resulted, and a second adoption report and the above-mentioned petition in juvenile court were filed. The pediatrician who examined the child described the mark on the child's face from the blow as being minimal but nevertheless a one- to two-inch discoloration.[1]

Petitioners thereafter consulted a Eugene psychiatrist, and the counsel appointed by the court for the baby had a Portland child psychiatrist make an independent investigation. Both psychiatrists testified and both were favorable to having the adoption petition granted. They felt that the therapist's approach to the problem had been wrong and that it had had an effect in precipitating the striking incident. They also testified that even for the very short time it occurred the association of the baby with wife as a mother figure was highly important and that a termination of that

---

[1] Besides the evidence of striking of the baby by wife, other evidence unfavorable to petitioners' adoption petition included husband's age and disparity in age with wife (husband will be 70 when the baby becomes 13 years old); husband seemed expectant of the baby's becoming "some kind of super child;" and there was fear that baby "couldn't live up to his expectations."

Miss Davis, director of the adoption department for the state Children's Services Division, testified that she had reviewed available investigated adoption homes "willing to accept a child on this risk basis when it's not fully legally free" and had found five she considered excellent. She was questioned about whether she and thus these adoptive parent prospects were aware of possible need for a new consent from the natural mother (*see* n 4) and of the possibility of appeals in these cases and she responded affirmatively.

association would result in what was described as an anaclitic depression of the baby. In questions by the court the Eugene psychiatrist stated:

> "I am not saying that I think it's helpful to the child's emotional development to be struck but I think you have to compare that being struck once with the potential damage that could be effected if the child were moved around from position to position and family to family during her first year of life. My feeling is that the damage that was done by the child being struck is much less than the damage that has been done by putting the child into detention and that sort of thing, and I feel that further delays of this procedure of adoption could be as damaging if not more so than being struck once.

> "Q.   What you are trying to say is that we had better decide this here now.
> "A.   Yes."

This psychiatrist also testified that in his opinion the best thing for the child would be immediate completion of the adoption by petitioners.

The above recounting of the procedures that have been undertaken and particularly of the evidence is only a summary of the voluminous records. We think it is adequate for an explanation of our conclusion in the cases although it is obvious that much more could be related. Much of that which could be related is favorable to petitioners. We have not overlooked such evidence.

## On the Assignments of Error

■ (1). Petitioners contend that a copy of a police investigation report about the alleged child abuse, which was attached to the adoption report of CSD submitted pursuant to ORS 109.310 (3) and (4), should

have been stricken and not considered on the ground the contents were hearsay and prejudicial. In ruling on the objection the judge said:

"* * * [A]nyone * * * should be able to determine it is a police report * * * that they are not verified statements * * * and should be able to recognize it just for what it is."

*Dugger et ux v. Lauless,* 216 Or 188, 338 P2d 660 (1959), holds: "* * * [T]he trial court was not required to accept as true everything that was stated in the report * * *" but that it is there " 'for the consideration of the judge * * *.' * * * *" 216 Or at 194 and 193. We find nothing in the cases cited by petitioners in support of this contention which indicates there was error. Further, the report was available before hearing, and the subpoena process was open to the parties.

■ (2). The petitioners complain that the judge gained "outside the record" knowledge when he made some remarks which implied he had looked at a baby. There is nothing specific in this assignment, for there is no real evidence that the judge looked at another two-and-one-half-month-old baby, or anything else to show there was prejudice to petitioners if he did.

■ (3). Petitioners assert the court erred in consolidating the cases for trial.

ORS 419.559 provides:

"Any proceeding in which the juvenile court is given exclusive jurisdiction may be consolidated with any other proceeding where:

"(1) Each of the proceedings to be consolidated relate, in whole or in part, to the same child or other person under 18 years of age, or to children or other persons under 18 years of age who have at least one parent in common; and

"(2) The proceedings involve the same or related issues of fact; and

"(3) The consolidation will not impair any constitutional right of a party to any of the proceedings."

The consolidation orders were based upon and were properly within the conditions required by this statute. In *Cutts v. Cutts,* 229 Or 33, 366 P2d 179 (1961), upon which petitioners rely, the court expressed doubt about the legislative wisdom of the statute, but it did not hold it invalid. Indeed, it noted that in *Watson v. Watson,* 221 Or 138, 350 P2d 694 (1960), the court had approved of consolidation of "proper" cases for trial under the forerunner of ORS 419.559, which was an almost identical statute. The other case upon which petitioners rely, *In Re Clara Marie Koger,* 206 Or 307, 292 P2d 791 (1956), is not in point because it preceded enactment of any consolidation statute, and there was then in effect a statute which required separate hearings in such matters.

■ (4). This contention is that the court erred in finding the child within the juvenile court's jurisdiction. The petition before the juvenile court alleged that the persons having custody of the child subjected the child to "cruelty and unexplained physical injury and failed to provide [the child] with the care and protection necessary for [the child's] physical, mental and emotional well-being." After the hearing on the adoption and the juvenile court petition, the court found that the allegations of the petitions "have been proven in that one of the persons having custody of the child * * * has subjected * * * [the child] to cruelty, physical injury and failed to provide * * * the care, guidance and protection necessary for [the child's] physical well-being * * *."

In support of this contention petitioners rely upon *Cutts v. Cutts,* supra, decided in 1961, and *State ex rel Juv. Dept. v. Christy,* 7 Or App 608, 492 P2d 476 (1972), which cited *Medina v. Medina,* 243 Or 629, 415 P2d 169 (1966). In *Cutts* the Supreme Court held that denial of a petition to adopt by a child's physical custodian does not necessarily mean that he is unfit to continue as physical custodian. In *Christy* we held that for a child to be declared a ward of the court its circumstances must come within the statute defining what children come within the juvenile court's jurisdiction (ORS 419.476), and cited as authority therefor *Medina.*

*Cutts* was one of the cases cited in *Medina* for the same proposition: that the "jurisdiction of the Juvenile court can only be invoked if the children are of the class defined in ORS 419.476 (1) * * *."② (243 Or at 632.) At the time *Cutts* was decided, there was no category under ORS 419.476 (1)(e) which included children who were in physical custody of a nonparent.

In *Medina,* which was decided in 1966, when the court cited *Cutts* and like cases, it did not note that by

---

② Cutts v. Cutts, 229 Or 33, 366 P2d 179 (1961), and similar cases were the subject of criticism in Larsen, *Trends in Oregon Family Law* 43 Or L Rev 193, 205-7 (1964). The author of that article at pp 211-12 stated:

"Recent decisions and legislation in Oregon dealing with family-law problems reveal a striking phenomenon. The Oregon Supreme Court and the Legislature appear to be working at cross purposes in dealing with fundamental adjustments in family relationships. Much of the latest legislation in the fields of adoption and juvenile-court proceedings appears to be designed to correct statutory interpretations by the court which are not consistent with the intent of the Legislature. Many of the decisions of the court seem to thwart legislative efforts to apply new and unusual solutions to complicated and controversial social problems."

Oregon Laws 1963, ch 496, § 1, the legislature had changed ORS 419.476 in several respects, two of which were adding a subsection (2) as follows:

> "The [juvenile] court shall have jurisdiction under subsection (1) of this section even though the child is receiving adequate care from the person having his physical custody.",

and changing the wording of subsection (1)(e) to include not only children whose parents, inter alia, "subjected [them] to cruelty" but also children who are subjected to such things by "any other person having [their] custody" as well.⑨ This statutory amendment remains in effect and it obviously has legislatively reversed the line of court authority on the same point exemplified by cases like *Cutts* which were decided preceding the date of the 1963 amendment.

Petitioners have cited many other authorities, some from Oregon decisions and some from other

---

⑨ ORS 419.476 (1) now provides:

"(1) The juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"(a) Who has committed an act which is a violation, or which if done by an adult would constitute a violation, of a law or ordinance of the United States or a state, county or city; or

"(b) Who is beyond the control of his parents, guardian or other person having his custody; or

"(c) Whose behavior, condition or circumstances are such as to endanger his own welfare or the welfare of others; or

"(d) Who is dependent for care and support on a public or private child-caring agency that needs the services of the court in planning for his best interests; or

"(e) Either his parents or any other person having his custody have abandoned him, failed to provide him with the support or education required by law, subjected him to cruelty or depravity or to unexplained physical injury or failed to provide him with the care, guidance and protection necessary for his physical, mental or emotional well-being; or

"(f) Who has run away from his home."

jurisdictions. On oral argument they relied particularly upon *Adoption of Lingol,* 107 Cal App 2d 457, 237 P2d 57 (1951), and *Adoption of Driscoll,* 269 Cal App 2d 735, 75 Cal Rptr 382 (1969). We do not consider those cases persuasive because they are based upon California statutes for adoption, and neither included a situation where a petition was filed in a juvenile court after child abuse had occurred, and in neither were adoption and juvenile cases consolidated for hearing under an appropriate statute providing therefor, as here. Additionally, in the first case, where the court held an adoption which was refused should have been granted, it was pointed out that the natural mother had signed two consents for the petitioners to adopt—the second after she learned that the welfare department opposed the adoption. *See* n 4.

In the second, the court said that it could not say the trial court abused its discretion when it refused the adoption on account of the advanced years of petitioners. But it reversed the trial court for placing the child with the welfare department "for further placement," because there was no statutory authority therefor. We have considered these and other authorities, but find the cases at bar to be controlled by Oregon's applicable statutes.

Ample competent evidence is in the record, part of which has been related in our foregoing factual statement, to support the finding of the trial court which forms the basis for its order declaring the child to be within the jurisdiction of the juvenile court. We come to the same conclusion based on that evidence.

(5, 6). These assignments allege error in the findings that the petitioners are not sufficiently able to bring up the child and that it is not fit and proper

that the adoption be effected. The fact statement which we have set forth in this opinion does not cover the details of the extensive record which we have reviewed, but it sufficiently illustrates that there is substantial evidence supporting the trial court findings. We have already noted that some evidence is quite favorable to the petitioners as adoptive parents. They undoubtedly sincerely want to have and raise a child and within themselves have the finest of motivations. Nevertheless, based upon the entire record which we have read, further details of which are unnecessary to set forth herein, we come to the same conclusions based upon the facts as did the trial court. The trial court's decisions were not easy and there were reasons why that judge might have come to different conclusions than he did. Nevertheless, his decisions appear to be soundly based upon the facts and law, and we come to the same basic conclusions.[2]

Affirmed.

---

[2] On March 8, 1974, which was about one month before the appeals were set for argument in this court, CSD moved to dismiss the appeal for mootness because the baby's mother had revoked her consent for adoption to petitioners and had given a consent for adoption to CSD. Among the affidavits filed with this motion was an assertion that the child has been placed since September 1973 in a foster home which CSD will designate as an adoptive home for the child if the ruling of this court affirms the circuit court. The motion to dismiss was denied with leave to raise it again which was done at oral argument.

Because of our ruling on the merits we do not reach the motion to dismiss but note in passing that, if we did reverse the trial court here, the new knowledge brought to our attention in the motion to dismiss might well require a remand for determination of the new questions, such as estoppel against the mother's revocation, which might be raised by such knowledge. *See* Hughes v. Aetna Casualty Co., 234 Or 426, 383 P2d 55 (1963); and Dugger et ux v. Lauless, 216 Or 188, 199, 338 P2d 660 (1959). Thus, the legal fact of the existence of mootness is doubtful.