Argued July 23, reversed and remanded for entry of a decree allowing the adoption August 11, 1975

IN THE MATTER OF THE ADOPTION OF S—, A MINOR.
D. ET AL, *Appellants, v.* STATE EX REL
CHILDREN'S SERVICES DIVISION
(No. 4983), *Respondent.*
538 P2d 947

*Herb Lombard,* Eugene, argued the cause for appellants. With him on the brief were Sahlstrom, Lombard, Starr & Vinson, Eugene.

*Al J. Laue,* Assistant Attorney General, Salem,

argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

LANGTRY, J.

Children's Services Division (CSD) of the State Department of Human Resources placed S—— in petitioners' home, after a commitment of the child to it from juvenile court, as a foster child when he was two months old. After about one-and-one-half years, petitioners sought to adopt him. CSD opposed the adoption, and the circuit court denied it, but the child was left with petitioners pending appeal. Petitioners in this appeal contend that the adoption would be "fit and proper" (ORS 109.350) and in the child's best interests; hence, the circuit court erred in denying it.

The natural mother has emotional problems and is, because of that, living in a supervised "group care home" in the same city as the other parties. She has given an informed and understanding consent to petitioners' adoption of the child; she occasionally visits, and hopes to keep on doing so. The petitioners at time of hearing were 58 and 57 years of age, in good health and stable financially. They had reared five children of their own and had five others as foster children placed with them by CSD at various times. Petitioners are rated by CSD as having an excellent foster home.

At first, CSD recommended the petition be granted, but only qualifiedly, because of petitioners' ages. Then it reversed itself, naming three reasons why it opposed: (1) the petitioners' ages, (2) rigidity of the

petitioner husband, and (3) the continuation of the natural mother in the picture. There was testimony that CSD has other good adoptive homes available. No reason was given why, during the first year and one-half, nothing apparent had been done by the agency to move toward a permanent placement.

The evidence did not support reason (2).

There is substance to the other two reasons. The first one, if it were the only reason for opposing the adoption, after a serious look at all of the facts, usually would be considered overcome by need of the child for continuity of the only parental relationship he has had.

Thus, in *In Re Adoption of Michelle Lee T.*, 44 Cal App 3d 699, 117 Cal Rptr 856 (1975), where the petitioners were 71 and 55 years of age, the California Court of Appeals held that there was insufficient evidence to support a "finding that the advancing age of petitioners *alone* was detrimental to the best interest * * *" of the child. (Emphasis supplied.) 44 Cal App 3d at 708. The court said:

"* * * The trial court was not asked to weigh available alternatives, but to remove [the child] from a warm, stable family home, merely because of petitioners' age, and set her adrift in a sea of bureaucratic uncertainty * * *." 44 Cal App 3d at 708.

The California court considered applicability of the opinion in *Adoption of Driscoll*, 269 Cal App 2d 735, 75 Cal Rptr 382 (1969), which is one of the authorities we cited in *H. v. Children's Services Division*, 17 Or App 395, 522 P2d 225 (1974). There ages of petitioners as a factor against adoption were given prominence, but neither of the citing courts (California nor this court) considered its reasoning to be a commanding precedent for denying an adoption petition on account of petitioners' ages alone.

The California court in *Michelle Lee* relied heavily upon the recent work, *Beyond the Best Interests of the Child,* by Goldstein, Freud, Solnit, as we did in *McClure and McClure,* 21 Or App 441, 535 P2d 112 (1975); *T. and T.,* 20 Or App 568, 532 P2d 1135 (1975); *Ellenwood and Ellenwood,* 20 Or App 486, 532 P2d 259 (1975).

The eminently qualified authors of that work, as we have noted in the above-cited opinions from this court, place emphasis upon the importance of a child —particularly under five years of age—having continuity of "psychological" parents. Before publication of that work, the same thing was emphasized by this court in *Smith v. Green,* 4 Or App 533, 536-37, n 1, 480 P2d 437 (1971):

> "In Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws,* 22 Vand L Rev 1207, 1208-09, 1212 (1969), the author states:
>
> > "'Any psychiatrist or psychologist, experienced parent, grandparent, or teacher will state that when there has already been one upheaval in the child's life due to divorce or some other misfortune, the first and foremost requirement for the child's health and proper growth is stability, security, and continuity. Dr. Andrew Watson, psychiatrist and professor of law, has said that stability is "practically the principal element in raising children, especially pre-puberty ones," and that "a child can handle almost anything better than he can handle instability." Furthermore, Dr. Watson maintains that "poor parental models are easier to adapt to than ever shifting ones." Similarly, Dr. Herbert Modlin of the Menninger Foundation stresses the importance of "constancy of mothering" and describes the characteristics of children in the various periods of preadolescent and preadult existence in which their needs

vary somewhat, but there is always the requirement of continuity and a sense of family, satisfying a need to belong.

" '* * * * * *

" '* * * Dr. Watson concludes that custody decisions once made "should nearly always be permanent and irrevocable" * * *.

" '* * * * * *' "

If the ages of petitioners were the only factor at bar militating against adoption, we could stop here. But we must consider the contemplated continuation of the natural mother's contacts in the periphery of this child's life and their possible effect upon the child, and weigh any negative effect thereof along with the negative effect of petitioners' ages.

The natural father is unknown; the mother has consented to the adoption and hopes to continue visiting the child. She is emotionally unstable, realizes it, and knows she is and will be unable to care for a child. She should not be institutionalized and lives in a "group care home." The lady who operates and supervises this home testified she has taken the mother on visitations to petitioners' home. She describes it as a "household of much love." When cross-examined about the natural mother's interest in S—— she said:

"She [the natural mother] loves him dearly. She loves him so much she's willing to give him to someone that does love him."

In *State v. Blum,* 1 Or App 409, 463 P2d 367 (1970), we held that chronic mental illness of one particular mother was reason for termination of her parental rights to a seven-year-old child who had been in lifelong foster care because, under applicable statutory law, it was in the child's best interests. Cursory comparison of that with this case might lead to the conclusion that it would be inconsistent to terminate the

*Blum* parental rights, but leave extant a connection between the mother and the adoptive parents at bar. But at bar, the adoptive parents would be in control. They have become, by the action of the mother, CSD and their own commitment, permanent psychological parents, whereas, in *Blum* the mother sought to forever leave the child in limbo where it had no permanent or stable parents. Besides, as a review of the facts in each case demonstrates, there are other profound differences between the respective circumstances.

We are persuaded by passages from *Beyond the Best Interests of the Child,* supra, at 17-22:

"* * * [F]or the child, the physical realities of his conception and birth are not the direct cause of his emotional attachment. This attachment results from day-to-day attention to his needs for physical care, nourishment, comfort, affection, and stimulation. Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his 'psychological parent' in whose care the child can feel valued and 'wanted.' An absent biological parent will remain, or tend to become, a stranger.

"* * * * *

"Adoption in the early weeks of an infant's life gives the adoptive parents the biological parents' chance to develop a psychological parent-child relationship. This chance is diminished if adoption occurs at a later stage, after the infant or young child has had earlier placements, where he has formed and broken earlier attachments, or experienced separations. It is also diminished by the statutory requirement of a trial period before adoption is finalized. Due to the uncertainty of that situation, the parents may hesitate during this period to make a full commitment to the child." (Footnote omitted.)

The petitioners as foster parents have made a full commitment to S——. There has been no break in the relationship that has been established. It does not appear that there is great danger from the minimal contacts the natural mother has with S—— and there would be great danger to the child's development if his relationship with petitioners was broken after two years of his life with them. Therefore, in spite of the substantial reasons advanced against the petition, we conclude that the arguments in favor of it carry the greater weight.

Reversed and remanded for entry of a decree allowing the adoption.