Argued January 19, reversed and remanded with directions February 9, reconsideration denied March 17, petition for review denied April 13, 1976

REFLOW, *Appellant,*
*v.*
REFLOW, *Respondent,*
SEABERT et ux, *Interveners-Appellants*
(No. 74085, CA 5158)

545 P2d 894

*Robert D. Herndon,* Gladstone, argued the cause and filed the brief for appellant Reflow.

*Sid Brockley,* Oregon City, argued the cause for interveners-appellants Seabert. With him on the brief were Jack, Goodwin & Urbigkeit, Oregon City.

*Ronald E. Hergert,* Oregon City, argued the cause for respondent. With him on the brief were Hibbard, Caldwell, Canning, Bowerman & Schultz, Oregon City.

Before Schwab, Chief. Judge, and Langtry and Thornton, Judges.

LANGTRY, J.

**LANGTRY, J.**

The interveners, Seaberts, and the subject children's father appeal from an order awarding custody of Becky and Butch, now aged 8 and 6, to mother. They have been in the physical custody of the interveners at Aberdeen, Washington for several years pursuant to the marriage-dissolution court's order. Interveners are sister and brother-in-law of father. Both appellants contend that it is in the children's best interests that they remain with interveners, and it is additionally contended that there has been no change in circumstances since the court's previous order justifying a change in physical custody.

The historical facts are complicated, indicating a strong basis for confusion, unrest and insecurity of the children. In June 1970 before the divorce proceeding between father and mother was filed, they executed and filed with the Clackamas County juvenile court a sworn instrument in which they stated that they were unable presently to give the children emotional and physical care, and asked the court to make the children its wards without hearing and to place them with interveners as guardians in Aberdeen, "understanding that we may approach the Court at any later time for a change in planning * * *." The juvenile court complied with their request. Thus, while the children were very young infants, the parents commenced positively—and later allowed passively—a series of events that by late 1973 had produced two children with serious emotional disturbances.

The divorce occurred in January 1971 and father was given custody of the children subject to continued jurisdiction of the juvenile court and to mother's visitations and continued counseling of the Child Guidance Center of Multnomah County. By July 1971 an order in the record recites father had apparently taken the children to Colorado, and father and mother were contending over visitations. Father later took the children to Nebraska and then they were brought back to

Colorado. The record does not show what occurred on these moves, but testimony shows that interveners went to Denver to get the children and return them to the security of interveners' home, and an affidavit of mother in September 1973 supports her motion seeking custody. In it she alleges she has remarried, father has failed to provide for her visitations with the children and he "has attempted to seek out the assistance of a relative or relatives to care for the minor children * * *." (These are the same relatives whom, in her sworn statement in 1970, she named and asked the court to make the legal guardians of the children.)

The court, apparently after hearing, in June 1974 awarded custody to mother subject to their remaining in the temporary physical custody of interveners "so long as the place of the Seabert residence remains unchanged or upon further order * * *." The order provided that interveners should make "all reasonable efforts to bring about conditions which will make it in the best welfare of the minor children * * *" to restore them to mother, and ordered visitations. After the court had ordered the Seaberts' complaint in intervention approved, finding they had standing therefor, the September 1975 hearing resulted in the change of physical custody and this appeal. We agree that the interveners had standing, based on the interveners' physical custody and the former requests of the parents which had triggered this unusual arrangement.

After the court ordered the change of physical custody to mother, realizing the decision between choices of living places was close, it commendably ordered a stay in execution of that order, pending this appeal, so that if the change were not affirmed, the children would be saved two more moves.

Evidence shows that mother has been remarried for four years and has one child by this marriage. She and her husband are in moderate circumstances and live in a rented two-bedroom home. Her expense in this litiga-

tion has been borne by the maternal grandmother. Mother's present husband has demonstrated job instability, but there are no major factors militating against their having physical custody of their own children. *See State v. McMaster,* 259 Or 291, 486 P2d 567 (1971).

When the children were returned to interveners' home in 1973 after their father had moved them about, they were immediately afforded counseling, first by a state mental health facility and then more permanently with Ronald Sherman, psychiatric social worker with the Washington Department of Social and Health Services. He has a Master's Degree from the University of Washington in his field of work and is quite experienced in child behavior. We quote at length from his testimony because it relates relevant facts about the children, their history and environment, and provides the primary basis of our decision:

"Q   [Counsel for interveners] Did you know Mr. and Mrs. Seabert before?

"A   I knew Paul [Seabert] professionally as the counsellor at the high school. I get many referrals from the high school.

"Q   But you didn't know Judy [Mrs. Seabert, who was a school teacher before devoting full time to the home]?

"A   No.

"Q   And you didn't know the children prior to that time?

"A   No.

"Q   Approximately when did you first see them?

"A   September of '74, when they first came to the office.

"Q   Can you tell me what * * * from then until now, what observations have you made of the children and what course of treatment you followed or course of counselling you followed?

"A   Okay. At the outset, Becky and Butch were referred together and I saw them individually. Butch was referred for extreme temper, cruelty to animals, and a lot of anger, angry kinds of things, hitting, fighting

with his cousins and his sister, and enuresis or bed wetting.

"Becky was referred for reasons of excessive fighting, excessive crying. She did a lot of crying, fighting with her cousins and her little brother, and hoarding food in her bedroom. Those were the presenting problems at the time.

"Initially I saw these children as experiencing a depressive reaction to an excessive amount of environmental and emotional stress. Simply stated, that means that they are very confused. They had a difficult time concentrating on appropriate behavior.

"* * * * *

"Q   Have you continued to see the children?

"A   I stopped seeing Butch when his behavior began to improve, after Mrs. Seabert and I discussed ways of handling his anger and so forth. Becky continued to be very unpredictable, a lot of crying and fighting and so forth, and I saw Becky periodically about once a month.

"Q   Up until the present time?

"A   Up until about a month ago, and then I have been seeing her every week. She's been experiencing a good deal of anxiety lately.

"Q   Now, do you have an opinion as to the cause of the emotional disturbances that you observed in the children initially, based on your history and examination and training?

"A   Basically I would say Butch and Becky, primarily Becky is suffering from an identity crisis. She does not know who she is. She has no effective role modeling in the past. She's been moved approximately six times in her seven years of life. Six sets of rules, six sets of expectations. She's very confused about what is expected of her.

"* * * * *

"A   In terms of Butch, he's become more outgoing, very friendly. He talks about things. He doesn't hold back too much any more. He has stopped lying considerably. At the outset, Butch could lie cold-bloodedly. It was very, very hard to tell whether he was lying or not. Now he starts feeling very guilty about lying. He's easy to catch in lies. He has, I think, modeled himself after Paul [Seabert] quite a bit and sees a lot of security with Paul

and is beginning to feel more and more valid about himself.

"* * * * *

"A   At the outset Becky was experiencing what I'd term free-floating anxiety. She would respond to any kind of tense conflict, anxiety provoking situations, with symbolic behavior. Her communication was kind of around the corner. She did not communicate directly. Part of her symbolic behavior is leaving notes around the house. She writes letters to Paul and Judy. She's written me a letter. Primarily these letters indicate: 'Hello, how are you? I am fine, I love you. Everything is fine. Love, Becky.'

"And what she is saying in these letters or what I interpret her saying is: Am I okay? Give me some messages that I am doing okay. Define some perameters [sic] for me.

"Now, over the last year she has begun to localize things that bother her. She's able to say, this bothers me, exactly this, and talk about it. That's about it.

"* * * * *

"A   Becky's coping mechanisms, in other words, how she deals with stress and conflict in everyday life, are pretty much determined by the people she's with. In other words, she tries very hard to live up to the expectations of the people she's dealing with.

"Q   Is that why she had so much difficulty in associating herself with six different environments?

"A   Yes. Very confusing for her.

"* * * * *

"A   In my experience in working with parents and children, a year's time in treatment with a parent and a child is a long, long time. I would say less than five percent of my clients stick it out that long, parents and children. That's an estimate, five percent. Very, very few, and what I'm trying to say is it takes a lot of dedication to do that and sensitivity.

"Q   Do you have an opinion as to whether or not the Seaberts are appropriate parents for these children?

"A   If I could be as fortunate to have parents like this with all the children I work with, my job would be a snap, yes.

"* * * * *

[ 371 ]

"MR. BROCKLEY [counsel for interverners]: Q Has she [Becky] talked to you about her visitations?

"A We have discussed her visitations, limited amount.

"Q Did she say anything significant that was a basis for your opinion?

"A I did ask her how she felt about moving. What she told me was: 'I like my mother but I'm scared of Carlos [stepfather].' [Becky said she does not want to 'live there.'] * * *

"* * * * *

"Q Have you noticed in your treatment of her any changes in her, either immediately before or immediately after a visitation down in Oregon?

"A Her behavior becomes more erratic. She becomes more tense, agitated. She reverts to her old style behavior, which is responding to any kind of tension with aggression, setting herself up for fighting with her brothers and sisters, rejection, these things. [Other parts of the record show the Seaberts have a boy and a girl of their own in the home. The youngest is a girl who was born the same day as Becky.]

"Q Do you have an opinion as to whether or not a change of physical custody from the Seaberts to Mrs. Williams would be detrimental to the children at this time?

"A In terms of treatment, I feel Becky has come a long ways in a year, and changing at this time could prove to be very detrimental for her, in my opinion.

"* * * * *

"Q In your opinion, would the children feel rejected if they were moved at the present time?

"A I think that's the basis of most of their difficulties at this time. The last six moves are seen as a rejection by these children, I'm sure.

"Q And you see that as a possibility?

"A Yes, it is a very real possibility."

■ Where parents are divorced and neither takes custody nor assumes care of the children, the children are often left with third parties, usually relatives, as here. In such instances often, also, litigation later results over custody sought by a parent, because the third

[ 372 ]

party has become attached to the children, and believes their best interests lie in remaining in the home they know. We have previously indicated our belief in the principle that continuity in one unchanging family environment, especially for young children, is probably the most important single element necessary to a child's wholesome development. *See D. v. Children's Services Div.,* 22 Or App 304, 538 P2d 947 (1975); *Ellenwood and Ellenwood,* 20 Or App 486, 532 P2d 259 (1975); *Smith v. Green,* 4 Or App 533, 536, 480 P2d 437 (1971). Several times we have quoted from J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* 33 (1973). *See, for example, Ellenwood and Ellenwood,* supra, 20 Or App at 488, n 1. The troubles of children who do not have continuing family and home environments as stressed by these authors are evidenced in the descriptions of the subject children quoted above from Mr. Sherman's testimony, and the causes therefor are obvious. The children are improving in the interveners' home, but slowly. Mother makes much of the fact they are still having problems there. We think it remarkable they do not have more than they do, and it is a great credit to interveners that this is so. Our de novo appraisal of the evidence is that another change in their home environment in the relatively near future probably would destroy the progress that has been made, probably would be the difference—particularly for Becky—as to whether they would have a chance at useful and happy lives.

But the mother contends this is not our criteria for decision, that the precedents are that where the contest for custody is between a parent and a third party, the parent is entitled to custody if the parent is not proven unfit. A case in which confrontations like that at bar occur is sometimes a continuing marriage-dissolution case, or a juvenile court case, or an adoption case or a habeas corpus proceeding. Statements to the effect contended for by mother have been made in

many such cases, and the principle involved has been the factor that has decided the case. *See, for example, Yost v. Phillips,* 21 Or App 464, 535 P2d 94 (1975), and cases cited therein, and *Yeamans v. Yeamans,* 17 Or App 556, 523 P2d 565, Sup Ct *review denied* (1974). However, in such cases there is also almost invariably found a statement that the preference to be accorded the parent is subject to the primary rule that the court "shall consider the best interests of the child and the past conduct * * * of each of the parties * * *." ORS 107.105(1)(a).[1]

Thus, in *Quinn v. Hanks,* 192 Or 254, 263-66, 233 P2d 767 (1951) (habeas corpus), it was said:

> "Ordinarily, a proceeding by habeas corpus involving the custody of a minor child is deemed to be an equitable proceeding, and in all such cases the polar star principle guiding the court in its final determination of the issues is the best interests and welfare of the child. On appeal to this court such cases are tried de novo * * *.
>
> "* * * * *
>
> "In fixing the custody of minor children, the divorce court is governed by the same considerations applied in the juvenile court, and in equitable proceedings in the nature of habeas corpus respecting the custody of infants, i.e., the welfare of the child."

In a continuing divorce case, *Bogh v. Lumbattis,* 203 Or 298, 305-06, 280 P2d 398 (1955), it was said:

> "The best interests of the minor are the governing criterion. What are the best interests have to be determined from the facts of each case. Indeed, it has sometimes become necessary for the court to separate a mother and child notwithstanding evidence of abundant affection and solicitude for the child and the absence of a taint of immorality on the reputation of the mother. *Kellogg v. Kellogg,* [187 Or 617, 213 P2d 172 (1949)]."

---

[1] ORS 107.105(1)(a) states that the court deciding child custody matters has authority to provide:

"For the future care and custody of the minor children of the marriage as it may deem just and proper. In determining custody the court shall consider the best interests of the child and the past conduct and demonstrated moral standards of each of the parties. No preference in custody shall be given to the mother over the father for the sole reason that she is the mother."

In this regard *see also, Ettin v. Robinson,* 221 Or 193, 207-08, 349 P2d 1097 (1960).

In *Parker v. Kotterman,* 208 Or 680, 682, 302 P2d 717 (1956) (habeas corpus), it was said:

"\* \* \* Evidently, she rested her claim to the custody of the child solely upon the mistaken belief that admission of the parental relationship [mother and child] existing between them was alone a sufficient warrant for a favorable order. 'But, the right of the parent is not a right of property in the child nor an absolute vested right to his custody.' \* \* \*"

*See also, Shrout v. Shrout,* 224 Or 521, 523, 356 P2d 935 (1960) (divorce); *Dugger v. Lauless,* 216 Or 188, 198, 338 P2d 660 (1959) (adoption); and *Smith v. Green,* supra (habeas corpus).

The Oregon precedent we have found most in point on its facts with the case at bar is *Langenberg v. Steen,* 213 Or 150, 322 P2d 1087 (1958), where the mother of a child had left the child from its infancy with an unrelated third person. The child recognized the third person as her parent. Then the mother demanded custody in habeas corpus. The trial court awarded custody to the mother. The court said:

"\* \* \* [I]n *Quinn v. Hanks,* [192 Or 254, 263, 233 P2d 767 (1951), we said]:

" '\* \* \* in all such cases the polar star principle guiding the court in its final determination of the issues is the best interests and welfare of the child.'

"Such consideration of the entire record in this proceeding leads this court to conclude that the welfare and interests of this child will be best served by retaining the custody of the child with the defendant. It is most heavily weighted by the fact that the only home ever known by this child has been in the home of the defendant. The evidence clearly reflects that she has there received every care and attention that a natural mother could bestow. To change the home and method of life of a girl now 15 years old [the child was 12 years old when the proceeding was commenced, according to the pleadings] under the circumstances disclosed by the evidence of this case would be highly detrimental to the best interests

and welfare of the child. It follows that the decree of the lower court must be reversed."

The case was remanded for the trial judge to fix times and conditions for the mother to visit. Importantly to the case at hand, there was no contention noted in *Langenberg* of unfitness on the part of the mother.

In a dissenting opinion in *Parmele v. Mathews,* 233 Or 616, 636, 379 P2d 869 (1963) (a 4-to-3 decision where the majority refused to consider a similar question to that presented here on a technical jurisdictional ground), Mr. Justice O'Connell (with two concurring justices), citing *Langenberg,* said:

"* * * But the best interest of the child is not the sole test for allocating custody in this class of cases. The interest of the parent must also be considered. A fit parent has the right to the custody of his minor children unless there are compelling reasons for depriving him of that custody. The parental right is not absolute. *Under some circumstances it may be necessary in the interest of the child's welfare to deprive a fit parent of his custodial right. It is possible that in some circumstances the uprooting of a child from his surroundings would be so inimical to his well-being that the parental claim to custody would have to be denied.*[7] It is not necessary for this court to now state more specifically what those circumstances must be; it is necessary only to explain why the circumstances in the present case do not warrant the application of the exception to the rule * * *.

"[7] See *Langenberg v. Steen,* 213 Or 150, 322 P2d 1087 (1958)." (Emphasis supplied.)

In the light of our recent decisions with reference to custody, and in the light of statutory law and precedent as we have reviewed them, we conclude that the facts at bar lead to the conclusion that such a change of circumstances has not occurred as indicates it is in the best interests of the children that their physical custody be changed. Here, we conclude circumstances exist that would make uprooting of the children from their surroundings so inimical to their well-being that the parental claim to physical custody must be denied.

[ 376 ]

Substantial time, barring a change in the interveners' family or home composition, should elapse before further motions are entertained for a change of physical custody. However, as in *Langenberg,* mother should be entitled to visitation at reasonable times, and she should be afforded the opportunity to be included in the ongoing counseling.

Reversed and remanded for further proceedings consistent herewith. Costs to no party.