494 A.2d 1316 (1985)
In the Matter of the Petition of D.I.S. for the Adoption of S.A.O.
No. 84-1138.
District of Columbia Court of Appeals.
Argued March 28, 1985.
Decided July 3, 1985.
*1318 H. Henning Vent, Washington, D.C., with whom Wallace J. Mlyniec, and Vince Forte, Law Student Counsel, were on brief, for S.A.O.
Donald L. Hamer, for S.J.G.
Betty S. Walker, for D.I.S.
Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.
PRYOR, Chief Judge:
In this case, we review an order of the trial court granting a petition by maternal grandmother, D.I.S., to adopt S.A.O., a six-year old girl. In the trial court, and now on appeal, S.A.O.'s foster mother, S.J.G., and the child's guardian ad litem, opposed D.I.S.' petition to adopt her granddaughter. Finding no abuse of discretion in the trial judge's ruling that adoption of S.A.O. by D.I.S. is in the best interests of the child, we affirm.

I
S.A.O. was born on December 7, 1978 to M.O., a Guyanese mother, and J.O., a Colombian father. S.A.O.'s father, J.O., was not in the United States at the time of her birth, having returned to his native Colombia, South America, to await issuance of a permanent visa.[1] After leaving the hospital following S.A.O.'s birth, M.O. and S.A.O. stayed briefly with D.I.S., the child's maternal grandmother. M.O. then took S.A.O. to stay at her apartment.
On January 8, 1979, M.O. entered the hospital for treatment of mental illness.[2] M.O. took S.A.O. with her to the hospital, *1319 and both were visited periodically by family members. D.I.S. made daily trips to the hospital to visit her daughter and grand-daughter.
In late January or early February 1979, M.O. placed S.A.O. in St. Anne's Infant Home. Placement of S.A.O. in St. Anne's was necessitated by M.O.'s continuing mental illness, J.O.'s absence from the country, and D.I.S.' demanding work schedule.[3]
On March 23, 1979, the District of Columbia Department of Human Services (hereinafter "DCDHS") placed S.A.O. in the custody of foster father R.G. and foster mother S.L.G. The G.s, a caucasian family with four natural children, had previously provided foster care for approximately ten children. At the time S.A.O. was initially placed with the G.s, the family lived in the Takoma Park subdivision of the District of Columbia.
By early August 1979, M.O.'s mental condition had improved, thereby allowing D.I.S. to assume care of S.A.O. D.I.S. looked after S.A.O. in the evening, and relied on a baby-sitter and M.O. to care for the child during the day. After only three weeks under this arrangement, however, M.O. returned S.A.O. to DCDHS.[4] DCDHS returned S.A.O. to the custody and care of the G.s.
D.I.S. saw her granddaughter once during S.A.O.'s initial stay with the G. family. During this period, D.I.S. experienced difficulty visiting S.A.O. because the G.s moved from Takoma Park in the District of Columbia to Hagerstown, Maryland.
On February 7, 1980, DCDHS made S.A.O. the subject of a neglect petition. As a result, on March 10, 1980, S.A.O. was ordered into the shelter care of the Social Rehabilitation Administration (hereinafter "SRA"). S.A.O. remained in the custody of the G.s during the time the neglect petition was pending.[5] On September 24, 1980, the court committed S.A.O. to the custody of the SRA and she remained in the G.'s care.
During late 1979 and 1980, D.I.S. saw S.A.O. regularly. The frequency and duration of these visits was limited, however, by DCDHS policies and personnel that made it difficult for D.I.S. to secure visitation rights. DCDHS personnel told D.I.S. at this time, for example, that visits are not usually arranged for grandmothers of children in foster care. After D.I.S. persuaded DCDHS to allow her to see S.A.O., the visits were limited to one hour per month, and were required to take place at DCDHS offices with S.J.G. present at all times. Even with these restrictions, D.I.S. was forced on three occasions to resort to use of an attorney to secure her visitation rights.[6]
On April 24, 1981, J.O. returned to the United States having finally obtained the *1320 proper visa. Upon J.O.'s return, D.I.S. requested visitation privileges for J.O., and J.O.'s mother. Despite this request, arrangements were not made for J.O. to see his daughter until June 15, 1981.
By mid-1981, S.A.O. had been in the custody of the G.s continuously for over two years, interrupted only by a three-week stay with D.I.S. Because of their growing attachment to S.A.O., the G.s decided to seek adoption of the child. On September 1, 1981, the G.s filed an adoption petition. In October 1981, a hearing was held on the G.'s adoption petition. At the hearing, J.O. expressed his desire to assume care of S.A.O., and asked the court for time to develop a plan for care of the child. J.O. was not able to take any steps to develop such a plan, however, because in November 1981, he entered St. Elizabeths Hospital for treatment of depression.[7]
On January 27, 1982, D.I.S. filed a petition to adopt S.A.O.[8] J.O. consented to this petition. DCDHS investigated the competing petitions to adopt S.A.O. filed by D.I.S. and the G.s. DCDHS supported the G.'s petition to adopt S.A.O. and opposed D.I.S.' Learning of this recommendation, D.I.S. petitioned the court to have an independent investigation of the placement alternatives conducted. This petition was granted, and the independent investigator supported D.I.S.' adoption petition.
Before the G.'s petition to adopt S.A.O. could be heard, R.G. and S.J.G. separated and initiated divorce proceedings. As a result of the separation and ensuing marital discord, R.G. withdrew his consent to the G.'s adoption petition. Because R.G. no longer consented to the adoption of S.A.O., as required by D.C.Code § 16-302 (1981), the trial court on April 3, 1984, dismissed the G.'s adoption petition. The trial judge ordered that a hearing on D.I.S.' petition to adopt S.A.O. be held on an expedited basis. Subsequently, S.J.G.'s petition to intervene in the proceedings on D.I.S.' adoption petition was granted.[9]

II
The hearing on D.I.S.' petition to adopt S.A.O. began on July 9, 1984. At the hearing, which spanned five days, the trial court had before it D.I.S.' petition to adopt S.A.O., S.J.G.'s pending petition to adopt S.A.O., and the underlying neglect jacket. Family members, social workers, a psychiatrist, psychologists, and the child's guardian ad litem testified at the hearing.
D.I.S., as well as other members of her family, articulated their love for S.A.O., and expressed their desire to have a relationship with the child. D.I.S. outlined her contacts with S.A.O., and cited the distance of Hagerstown, Maryland, and administrative obstacles created by DCDHS as reasons why she had not visited the child more frequently. D.I.S. also described her plans for the care of S.A.O.
S.J.G. described her love for S.A.O. and the care she had given the child. S.J.G. voiced her intention to adopt S.A.O. as soon as her divorce was final, and brought the court numerous exhibits, including family photographs, which sought to portray the loving, stable, multi-cultured network of family and friends in which S.A.O. had grown up.
Various social workers testified concerning their investigations of the G. family and D.I.S. Ms. Barbara Bailey, a D.C. Superior Court Probation Officer who had investigated both petitions, testified in favor *1321 of D.I.S.' adoption petition. In this regard, Ms. Bailey cited the fact that D.I.S. was S.A.O.'s natural relative, had numerous family supports, and possessed adequate financial resources to care for the child.
Three other social workers, Elizabeth Braxton and Faye Spencer of DCDHS, and Josephine Brennan of Washington County, Maryland, supported S.J.G.'s adoption of S.A.O. As reasons for supporting S.J.G.'s petition, all three cited the good care afforded S.A.O. by her foster mother, and the strong emotional attachments between S.A.O. and her foster family.
Several mental health professionals testified at the hearing. While their testimony differed in many respects, all agreed that S.A.O. viewed S.J.G. as her psychological mother, had strong emotional attachments to her, and would experience significant trauma and emotional distress in the near-term if forced to leave her foster family. These mental health professionals also agreed that S.A.O.'s strong preference was to remain in the custody and care of S.J.G.
Dr. Eva R. Towns, a psychiatrist, testified in favor of D.I.S.' adoption petition. While acknowledging that removal from the foster family would cause S.A.O. some trauma, Dr. Towns opined that the risk of placing S.A.O. with D.I.S. was one worth taking because of D.I.S.' continuity in the life of S.A.O., her constant love and affection for the child since birth, and S.A.O.'s future needs for cultural and racial support.
Dr. Towns cited the instability of the G. family as an important factor militating against S.A.O. remaining with S.J.G. Dr. Towns described in detail how R.G. had rejected S.A.O. since his separation from S.J.G.[10] In Dr. Towns' view, the turmoil in the foster family was very detrimental to S.A.O., and was a compelling factor supporting placement of the child with D.I.S.[11]
Dr. Towns also stated that the strong support system in the natural family, consisting of S.A.O.'s father, paternal grandmother, aunts, and uncles was a factor strongly favoring placement of the child with D.I.S. Finally, Dr. Towns testified that S.A.O. would seek her cultural identity at a later stage in her development and would experience anger when she discovered that her natural family had sought to rear her in an environment where her heritage and culture could be nurtured but were not permitted to do so.
Two psychologists, Drs. Herbert Hagenau and Carl Hay, testified in support of S.J.G.'s adoption petition. Both stated that S.A.O. would be better able to cope with long range problems  whether racial or cultural  if her placement with S.J.G. continued. Drs. Hay and Hagenau also stated that they found S.J.G. to be sensitive, effective, and low-key in her dealings with S.A.O.'s racial background.
At the conclusion of the hearing, the trial judge announced her ruling which granted D.I.S.' petition to adopt S.A.O. This oral ruling was followed by written findings entered on July 27, 1984. In ruling that D.I.S.' adoption of S.A.O. was "in the best interest of the child in the long run," the trial judge focused primarily on the importance of the natural family, and the support system available to D.I.S. in raising S.A.O.
In comments accompanying the oral ruling, the trial court initially noted that bonding between S.A.O. and S.J.G. had occurred, and "that a very good life has been provided for S.[A.O.] in the care and custody of the [G.] family." The trial judge *1322 went on, however, to state her conclusion that while S.A.O. will suffer trauma "at being uprooted at this time ... that trauma will be less and ... she will be able to cope with it better than ... if the transfer or the search for her roots comes at a point in adolescence." The court also observed that placement of S.A.O. with S.J.G. would not enhance the child's cultural background through exposure to her natural family "to the extent the court believes is necessary." In support of this conclusion, the court noted that in the past, the foster mother has shown "nothing more than strict adherence to the dictates of the Department of Human Services in allowing exposure to the natural family."[12]
Next, the court stressed the importance of the extensive support group available to D.I.S. The court noted that D.I.S.
does have the support system of a younger daughter and a younger son, that is younger naturally than herself.... And she has the assistance of the father of the child, whose age is appropriate for dealing with a small child and whose association will grow and who doubtless, will have much to contribute in terms of planning for the child.
The trial judge reiterated similar points in written findings issued on July 27, 1984. In these written findings, the court stressed the detrimental effect on S.A.O. of the G.'s marital discord, and of R.G.'s rejection of her. In concluding the written order, the judge articulated the impact of various factors she had considered in granting D.I.S.' adoption petition:
While the Court recognizes ... the undisputed bonding that has occurred [between S.A.O. and S.J.G.], the natural family is just that to the adoptee and is equally well equipped, if not more so, from a financial basis; has the potential for sharing at least as much love; is at least equally well equipped to apply standards of morality and proper upbringing; is better equipped as living examples thereof to inject into the life of the adoptee the real sense of her Guyanese/Latino heritage and culture, and they are equally well equipped to develop a sense of bonding in the future.
A final decree of adoption was granted on July 27, 1984. On September 18, 1984, this order was corrected to indicate that the decree was an interlocutory one. This appeal followed.

III
In deciding an adoption case, the trial court may enter a decree when it is satisfied, among other things, that "the adoption will be for the best interests of the prospective adoptee." D.C.Code § 16-309(b)(3) (1984 Supp.). The "best interests of the child" standard has been the basis of decision in child custody cases in this jurisdiction since the beginning of this century. See Wells v. Wells, 11 App.D.C. 392, 395 (1897); see also Bazemore v. Davis, 394 A.2d 1377, 1379 (D.C.1978) (en banc); In re J.S.R., 374 A.2d 860, 863 (D.C.1977). The best interests standard is now accepted as the test to be applied in child custody cases between spouses, Coles v. Coles, 204 A.2d 330 (D.C.1964); between a natural parent and foster parents, In re N.M.S., 347 A.2d 924 (D.C.1975); and in child neglect proceedings, In re Lem, 164 A.2d 345 (D.C. 1960). This court has also applied the best interests of the child standard in a case involving a contest for adoption between foster parents and a maternal grandmother *1323 similar to that presented here. In re R.M.G. and E.M.G., 454 A.2d 776 (D.C. 1982).
We have recognized that the best interests of the child standard "does not contain precise meaning." In re J.S.R., supra, 374 A.2d at 863. See also In re J.O.L., 409 A.2d 1073, 1075 (D.C.) (cumulative lesson of approach is that it "cannot operate with pinpoint precision"), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 110 (1979). This lack of specificity is appropriate, however, "given the multitude of varied factual situations which must be embraced by such a standard...." In re J.S.R., supra, 374 A.2d at 863. Despite the flexibility inherent in the best interests of the child standard, however, the concept is not without content or bounds. We have stated that the standard,
requires the judge, recognizing human frailty and man's limitations with respect to forecasting the future course of human events, to make an informed and rational judgment, free of bias and favor, as to the least detrimental of the available alternatives.
Id.[13]
Application of the best interests of the child standard "in a particular case presents one of the heaviest burdens that can be placed on a trial judge." Coles v. Coles, supra, 204 A.2d at 331. In reviewing this difficult decision, we will reverse only for an abuse of discretion. See In re R.M.G. and E.M.G., supra, 454 A.2d at 790; Moore v. Moore, 391 A.2d 762, 770 (D.C.1978); O'Meara v. O'Meara, 355 A.2d 561, 562 (D.C.1976). In applying the abuse of discretion standard of review,
we check to be sure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor.... We then evaluate whether the decision is supported by "substantial" reasoning, ... "drawn from a firm factual foundation" in the record.
In re R.M.G. and E.M.G., supra, 454 A.2d at 790 (citations omitted); see also D.C. Code § 17-305(a) (1981). To assure proper review under the abuse of discretion standard, the rules of court require detailed, written findings of fact and separate conclusions of law on all matters. Super.Ct. Dom.Rel.R. 52(a); Moore v. Moore, supra, 391 A.2d at 770; O'Meara v. O'Meara, supra, 355 A.2d at 562.
In this case, it is clear that the trial court did not abuse its discretion in finding that D.I.S.' adoption of S.A.O. would be in the best interests of the child. In granting D.I.S.' adoption petition, the court exercised its discretion within the range of permissible alternatives. The court's decision was made after an exhaustive five-day hearing, and upon consideration of numerous factors bearing on the best interests of the child.[14] Among the factors considered by the trial judge in her oral observations *1324 and written ruling were: (1) the bonding that had occurred between S.A.O. and her foster mother; (2) the trauma S.A.O. would experience in the near-term if D.I.S.' adoption petition were granted; (3) the trauma the child would face in adolescence if adopted by S.J.G.; (4) the extensive support group available to D.I.S. in raising the child; (5) financial resources; (6) the impact on S.A.O. of problems in the foster family; (7) the potential of both families to share love; (8) the ability of the two families to convey standards of morality and proper upbringing to the child; (9) love for the child; and (10) the respective abilities of the two families to give S.A.O. a real sense of her Guyanese/Latino heritage.
The trial judge recognized the bonding that had occurred between S.A.O. and S.J.G., and the good home that had been provided by the foster mother. Still, the trial judge granted D.I.S.' petition because of the extensive support group of relatives available to the grandmother, the adverse effect marital problems in the foster family would have on the child, the trauma S.A.O. would face in adolescence in searching for her roots if placed with S.J.G., and D.I.S.' greater ability to foster the child's sense of her Guyanese/Latino heritage. Given these careful and thorough findings, it is clear that the trial court's decision was supported by substantial reasoning drawn from a firm factual foundation. Thus, no abuse of discretion occurred.

IV
Several arguments are advanced to support the claim that the trial judge erred in granting D.I.S.' adoption petition. First, S.A.O.'s guardian ad litem asserts that the trial judge abused her discretion by failing to give adequate weight in the best interests of the child analysis to S.J.G.'s status as psychological parent of S.A.O., and to the continuity of care and sense of belonging the child received from the foster family.[15] In so doing, the guardian ad litem argues,
the trial court explicitly discounted a warm loving relationship, developed between S.A.O. and the G. family and the great deal of trauma to S.A.O. which would be created by her removal. Instead, the court opted for an immediately detrimental alternative of placing the child with a family which the court found equipped to develop a sense of bonding "in the future."
The guardian ad litem asserts, therefore, that "the removal of S.A.O. from her foster home and subsequent adoption by her grandmother was plainly wrong and an abuse of discretion."
*1325 In essence, this argument urges that we give the factors of psychological parentage and continuity of care primary importance in determining the best interests of the child in custody cases. While we recognize the significance of these factors in the best interests analysis, we decline to assign them special weight.
It is certainly true that psychological parentage and continuity of care are important factors in determining the best interests of the child. See, e.g., Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (recognizing importance of preserving family unit already in existence); Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844-45, 97 S.Ct. 2094, 2109-10, 53 L.Ed.2d 14 (1977) (recognizing importance of intimacy of daily associations, and rejecting characterization of foster family as "mere collection of unrelated individuals"); Reflow v. Reflow, 24 Or.App. 365, 373, 545 P.2d 894, 899 (1976) (continuity in one unchanging family environment is probably most important single element necessary for a young child's wholesome development). Nevertheless, as noted above, our cases have recognized that the best interests standard "does not contain precise meaning," In re J.S.R., supra, 374 A.2d at 863, "and cannot operate with pinpoint precision." In re J.O.L., supra, 409 A.2d at 1075. We have stressed that each case must be dealt with on its own terms, and have rejected the use of presumptions for determining the best interests of the child. See Bazemore v. Davis, supra, 394 A.2d at 1383 (rejecting "tender years" presumption that small children are better off with their mother); In re R.M.G. and E.M.G., supra, 454 A.2d at 795 (rejecting use of race as presumption) (concurring opinion). In Bazemore, we explained the importance of approaching each case on its own terms:
A norm is ill-suited for determining the future of a unique being whose adjustment is vital to the welfare of future generations. Surely, it is not asking too much to demand that a court, in making a determination as to the best interest of a child, make the determination upon specific evidence relating to that child alone. As one court has aptly noted, magic formulas have no place in decisions designed to salvage human values.
Bazemore v. Davis, supra, 394 A.2d at 1383 (citing Lemay v. Lemay, 109 N.H. 217, 218, 247 A.2d 189, 191 (1968)). Thus, the suggestion that we recognize psychological parentage and continuity of care as the determinative factors in the best interests of the child analysis runs counter to the flexible framework established in our cases for making this critical decision.
In this case, the trial judge clearly considered the factors of psychological parentage and continuity of care in determining whether D.I.S.' adoption of S.A.O. would be in the best interests of the child. In her oral observations at the close of trial, the trial judge recognized the bonding that had occurred between S.A.O. and her foster mother, and the good life that had been provided for S.A.O. by the G. family. Nevertheless, in granting D.I.S.' adoption petition, the trial judge found that other factors outweighed psychological parentage and continuity of care in determining the best interests of S.A.O. This thoughtful and careful weighing of factors was a proper exercise of discretion.
Next, it is argued that in this case, D.I.S. should have been required to meet a "clear and convincing" standard of proof because as a non-custodial non-parent, she sought to remove S.A.O. from the care of a custodial non-parent. Appellants assert that a standard of proof higher than preponderance of the evidence is required "when a non-parent claimant to the custody of a child seeks to destroy an existing and continuous stable affection-relationship between a custodian and a child." We disagree.
*1326 "The right of a natural parent to raise one's child is a fundamental and essential one which is constitutionally protected." In re J.S.R., supra, 374 A.2d at 863 (emphasis added); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Thus, in a contest for adoption between a natural parent and a non-parent, the natural parent enjoys the protection of certain constitutional rights.[16] Such is not the case, however, when two non-parents contest the custody of a child. In that situation, neither party can claim a constitutionally protected interest in custody of the child, and both share a common goal: to determine the placement that is in the best interests of the child. See Kyees v. County Department of Public Welfare, 600 F.2d 693 (7th Cir.1979) (foster parents have no constitutionally protected interest in continued custody of foster child); Drummond v. Fulton County Department of Family & Children's Services, 563 F.2d 1200 (5th Cir.1977) (en banc) (same), cert. denied, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978).
Preponderance of the evidence has been defined as "proof which leads the jury to find that the existence of the contested fact is more plausible than its non-existence." McCORMICK ON EVIDENCE § 339 (E. Cleary 3d ed. 1984). The standard "clear and convincing" evidence imposes a higher burden of proof, and has been defined as that evidence which will "`produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'" District of Columbia v. Hudson, 404 A.2d 175, 179 n. 7 (D.C.1979) (en banc) (citing In re Estate of Soeder, 7 Ohio App.2d 271, 220 N.E.2d 547 (1966)). Thus, it is axiomatic that the evidence in a case could establish the existence of a fact by a preponderance of the evidence, yet fail to do so by clear and convincing evidence.
In light of the goal of adoption proceedings to determine the best interests of the child, use of the preponderance of the evidence standard is most appropriate. Under appellant's argument, when a preponderance of the evidence establishes that adoption by a non-custodial non-parent is in the best interests of the child, the child would remain in the custody of the custodial non-parent when the evidence is less than clear and convincing. Given our focus on the child's best interests, such a result is peculiar.[17] Moreover, application of the higher standard is particularly inappropriate in this case because J.O., S.A.O.'s natural father, consented to D.I.S.' adoption petition.
Finally, appellants argue that the trial court abused its discretion in failing to consider the factor of race in accordance with the three-step approach articulated in the lead opinion in In re R.M.G. and E.M.G., supra, 454 A.2d at 791-92. We disagree.
As a threshold matter, we note that the lead opinion in R.M.G. and E.M.G., which articulated the three-step approach, was adopted by no other member of the panel. Thus, the lead opinion in R.M.G. and E.M.G. established no precedent binding on this panel and we are not constrained to follow it.
We decline to apply the three-step approach articulated by the lead opinion in *1327 R.M.G. and E.M.G. because it represents, in our view, an unwarranted and unwise intrusion into the trial court's exercise of discretion in inter-racial adoption cases. The approach is unwarranted because there is no need to reach the constitutional issue of equal protection in such cases. As explained by Judge Mack in her concurring opinion in R.M.G. and E.M.G.:
The Adoption Statute mentions race and religion only as factors to be supplied along with other information in a petition for adoption. D.C.Code 1973, § 16-205. It does not require that the court give these factors any consideration whatever; it only provides that the court, after the consideration of the petition and other evidence, may enter a decree when it is satisfied that the adoptee is suitable for adoption, that the petitioner is fit and able to provide a proper home and education, and that the adoption will be for the best interest of the adoptee. Id. § 16-309. We are thus not faced with a statutory scheme separating persons solely on the basis of racial classifications (see Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)), or an affirmative action program allegedly giving preference on the basis of racial classifications (see Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). Therefore, however tempted one may be to re-argue interesting constitutional issues, I may refrain from doing so.
Id. at 794-95 (footnote omitted). Thus, the equal protection clause of the constitution does not require "strict scrutiny" of the trial judge's findings in an interracial adoption case.
The three-part approach in R.M.G. and E.M.G. is unwise primarily because it effectuates a sharp departure from the flexible framework developed in our decisions for determining the best interests of the child. See supra at 1322-1324. This flexible approach, which requires the trial judge to carefully weigh all the factors bearing on the child's best interests, enjoys virtually unanimous acceptance and represents the current wisdom on making this critical determination. The three-step approach undermines this analysis because it selects out the factor of race for special consideration under a highly structured three-part test.[18]
Moreover, the three-step approach adds little to the traditional best interests analysis. Our cases already require the trial judge to weigh all relevant factors bearing on the best interests of the child, and to make detailed, written findings of fact and separate conclusions of law on each factor considered. See Super.Ct.Dom. Rel.R. 52(a); Moore v. Moore, supra, 391 A.2d at 770; O'Meara v. O'Meara, supra, 355 A.2d at 562. The third prong of the three-step approach requires the trial judge to evaluate, "how significant the racial differences between the families are when all the factors relevant to adoption are considered together." In re R.M.G. and E.M.G., supra, 454 A.2d at 791. In our view, the traditional best interests analysis already implicitly requires that this inquiry be conducted.
Finding no abuse of discretion in the ruling of the trial court, the order on appeal is hereby
Affirmed.
*1328 FERREN, Associate Judge, concurring:
I concur in the opinion of the court, except for the final five paragraphs dealing with In re R.M.G., 454 A.2d 776 (D.C.1982), for I believe the three-step approach prescribed there is always required when race is at issue in an adoption contest. Accordingly, I would write the final portion of the opinion as follows:
Finally, appellants argue that the trial court abused its discretion in failing to consider the factor of race in accordance with the three-step approach articulated in R.M.G., 454 A.2d at 791-92. Because it does not appear that this three-step approach would have affected the result under the facts of this case, its omission from the trial court's analysis provides no basis for reversal.
In R.M.G., the lead opinion stated:
When race is relevant in an adoption contest, the court must make a three-step evaluation: (1) how each family's race is likely to affect the child's development of a sense of identity, including racial identity; (2) how the families compare in this regard; and (3) how significant the racial differences between the families are when all the factors relevant to adoption are considered together.
454 A.2d at 791. Race is a statutory factor which the court may consider, when appropriate, D.C.Code § 16-305 (1981); R.M.G., 454 A.2d at 783-84, and it is "relevant," in the sense used here, whenever there are racial differences between the child and one or more of the prospective adopting families.
In this case, not only race but, more broadly, S.A.O.'s cultural identity  Guyanese/Latino  is at issue. We need not consider how an R.M.G.-type analysis should have been applied here to this broader issue, where the racial and cultural backgrounds of the prospective adopting parents differ. We assume it is possible that a more scrutinizing analysis to some extent would have affected the trial court's finding that D.I.S. and S.A. O.'s natural family are "better equipped as living examples ... to inject into the life of the adoptee the real sense of her Guyanese/Latino heritage and culture." Nonetheless, however significant or insignificant "the racial [and cultural] differences between the families are when all factors relevant to adoption are considered together," 454 A.2d at 791, it is clear that the court would still have granted D.I.S.' petition.
This is not a case "where there is every indication from the trial court's analysis that, but for consideration of race [and culture], the decision might have been different." 454 A.2d at 794. The trial court's decision was heavily influenced by the support group available to S.A.O. from the extended natural family, including her father, as well as by the turmoil in the foster family, including discriminatory treatment of S.A.O. by S.J.G.'s estranged husband. Furthermore, the court found D.I.S.' family "equally well equipped, if not more so, from a financial basis." Although the court also was influenced by D.I.S.' ability to promote S.A.O.'s cultural background and heritage, it is clear that, even if S.J.G. ranked equally high on that factor (she obviously could not have ranked higher), the other factors would have led the court, on balance, to a conclusion that adoption by D.I.S. would be in S.A.O.'s best interest.
NOTES
[1] J.O. returned to Colombia, South America, prior to learning that his wife was pregnant. Because of problems securing the visa, J.O. did not return to the United States until April 21, 1981.
[2] M.O. had been chronically mentally ill since 1969 and had been hospitalized seven times during the period 1969 through 1979.
[3] At the time S.A.O. was placed in St. Anne's, D.I.S. was working twelve hours a day and was the sole source of financial support for M.O. and S.A.O. At this time, D.I.S. attempted unsuccessfully to arrange day care for S.A.O. Such day care would have allowed D.I.S. to care for S.A.O. and thus would have made it unnecessary to place the child in St. Anne's.
[4] The precise circumstances of S.A.O.'s return to DCDHS are unclear. D.I.S. claims that M.O. took this action in a mentally ill condition and against her wishes. Further, D.I.S. maintains that she approached DCDHS and requested that the child be returned, but that this request was refused.
[5] At a hearing on the neglect petition, Ms. Marion E. Baurley, S.A.O.'s guardian ad litem, urged D.I.S. to resume care of S.A.O. before the child entered the child neglect system. At this time, however, D.I.S. declined to intervene, citing J.O.'s imminent return to the United States, and the inappropriateness of taking such action without first being requested to do so by S.A.O.'s parents. D.I.S. was also concerned that if she regained custody of S.A.O. before J.O.'s return, M.O. would again act to jeopardize the child's welfare.
[6] In early 1981, D.I.S. experienced exhaustion, underwent surgery, and took an extended recuperative trip to New York and Guyana. These circumstances limited the frequency of D.I.S.' visits with S.A.O. during this period.
[7] J.O. remained hospitalized until January 1984, at which time he assumed outpatient status.
[8] S.A.O.'s natural mother, M.O., died on January 1, 1982.
[9] Under D.C.Code § 16-302 (1981), S.J.G. was prevented from petitioning to adopt S.A.O. while separated from R.G. because R.G. refused to consent to the adoption. In her motion to intervene, S.J.G. notified the court that she intended to petition for the adoption of S.A.O. as soon as her divorce became final.
[10] One way R.G. manifested his rejection of S.A.O., Dr. Towns noted, was by giving Christmas presents to his natural children but not to S.A.O.
[11] Dr. Towns also noted that R.G.'s negative attitude toward S.A.O. would be an ongoing problem for the child because R.G. had been granted frequent visitation rights with his natural children.
[12] In its written ruling, the trial court rejected the contention made by S.J.G. and DCDHS that D.I.S.' adoption petition represented a renewed interest in ties with S.A.O. Rather, the trial court found that administrative obstacles faced by D.I.S. explained her infrequent contacts with S.A.O. In her written findings, the trial judge found: "The petitioner had maintained virtually all the contact with her granddaughter that the Department of Human Services would allow, being restricted to one visit a month for one hour only, and that occurring only in the presence of a social worker, and usually, the foster mother."
[13] In Coles v. Coles, supra, 204 A.2d at 331-32, we described the task facing the trial judge in applying the best interests of the child standard as follows:

Out of a maze of conflicting testimony, usually including what one court called "a tolerable amount of perjury," the judge must make a decision which will inevitably affect materially the future life of an innocent child. In making his decision the judge can obtain little help from precedents or general principles. Each case stands alone.... [T]he question for [the trial judge] is what is best for the child within the limitations presented. When the judge makes his decision, he has no assurance that his decision is the right one. He can only hope that he is right. He realizes that another equally able and conscientious judge might have arrived at a different decision on the same evidence.
[14] The trial judge prefaced the observations accompanying her oral ruling by acknowledging the gravity and difficulty of the case as follows: "The court ... has not recalled in the course of this trial any case which has been more involved with serious questions, ... the resolution of which will result no matter what the decision is, in unhappiness and trauma on the part of someone."
[15] The concept of "psychological parentage" is controversial in the field of psychology. The term "psychological parent" has been defined in a leading work as "one who, on a continuing, day to day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent as well as the child's physical needs. The psychological parent may be a biological, adoptive, foster or common-law parent, or any other person." J. GOLDSTEIN, A. FREUD, A. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 98 (1973). Establishment of the parent-child relationship is important under the psychological parentage theory because stable early attachments fulfill a child's needs:

Such primitive and tenuous first attachments form the base from which any further relationships develop. What the child brings to them next are no longer only his needs for body comfort and gratification but his emotional demands for affection, companionship, and stimulating intimacy. Where these are answered reliably and regularly, the child-parent relationship becomes firm, with immensely productive effects on the child's intellectual and social development.
Id. at 18. Conversely, where no relationship with a psychological parent exists, or the relationship is disrupted, harmful consequences are said to result:
Where parental care is inadequate, this may be matched by deficits in the child's mental growth. Where there are changes of parent figure or other hurtful interruptions, the child's vulnerability and the fragility of the relationship become evident. The child regresses along the whole line of his affections, skills, achievements, and social adaptation.
Id. Thus, adherents to the theory of psychological parentage assert that multiple separations from parent figures lessen a child's ability to develop physically, emotionally, and mentally.
[16] It is noteworthy, however, that the right of a natural parent to raise his or her child is not an absolute one. Rather, "[t]he state has both the right and the duty to protect minor children through judicial determinations of their interest." In re J.S.R., supra, 374 A.2d at 863; see also Stanley v. Illinois, supra.
[17] We distinguish In re J.S.R., supra, 374 A.2d at 864, in which the "clear and convincing" standard of proof was made applicable to determinations of whether a natural parent was withholding consent to the adoption of his child contrary to the child's best interests. In J.S.R., the higher standard was applied because of the natural parent's constitutionally protected interest in raising his own child. As noted above, the custodial non-parent in this case can claim no such constitutionally protected interest.
[18] This case illustrates the problems associated with the three-step approach. A careful review of the record and the trial court's findings in this case indicates that race, as such, was not a factor in the trial judge's determination of S.A. O.'s best interests. Rather, the trial judge's decision was based on the support group available to D.I.S., problems in the foster family, and the grandmother's ability to foster S.A.O.'s cultural background and heritage. Nonetheless, because of the racial differences between S.A.O. and S.J.G., appellants presented extensive and elaborate arguments that the trial judge abused her discretion in not applying the R.M.G. and E.M.G. three-step approach to consideration of race. In the circumstances of this case, such arguments are not only irrelevant, but deflect the focus of inquiry from where it properly belongs: consideration of the child's best interests.