**In the Matter of BABY GIRL D.S.**

**Appeal of V.V., Appellant.**

**No. 89–1513.**

District of Columbia Court of Appeals.

Argued Feb. 28, 1991.
Decided Nov. 27, 1991.

---

72

Before FERREN, STEADMAN, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

In this case, the trial court denied, without prejudice,[1] a guardian *ad litem's* motion to terminate the parental rights of a fifteen-year-old natural mother, T.S. In declining to terminate, the court did not conclude the mother was a fit parent. Rather, by looking ahead to a pending adoption contest in which the foster mother and the maternal grandparents both sought to adopt the baby girl, the court concluded that termination would harm the child by cutting off access to both her mother and her grandparents, the E.s, before the adoption issues could be resolved. Appellant V.V., the court-appointed foster mother of the baby girl, D.S., has appealed. Having intervened in this proceeding because of her interest in adopting the child, V.V. claims, primarily, that the trial court (1) abused its discretion by failing to consider the physical, mental, and emotional health of the mother, T.S., as the statute requires; (2) improperly considered a "grandparent" factor in deciding not to terminate the mother's parental rights; and (3) improperly weighed the impact of termination on the pending adoption proceeding. V.V.'s contentions may have some merit when considered wholly in the context of the termination proceeding. But we perceive a fundamental procedural flaw in the earlier refusal of the trial court (not the trial judge here) to consolidate this case with the contested adoption proceeding. Therefore, rather than order a new termination proceeding, we reverse and remand for consolidation of this case with the pending adop-

Robert E. Sylvester, Washington, D.C., appointed by the court, for appellant.

Donna L. Wulkan, Washington, D.C., appointed by the court, for appellee T.S.

---

1. The trial court's oral and written findings of fact, conclusions of law, and order do not expressly say that the court denied the motion to terminate without prejudice. However, the termination statute and its legislative history apparently intend that the court's order be deemed a dismissal without prejudice. D.C.Code § 16-2359(f) (1989); COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON TITLE IV OF BILL No. 2-48, "THE PREVENTION OF CHILD ABUSE AND NEGLECT ACT OF 1977," at 29 (March 29, 1977) (COUNCIL REPORT) ("Provision is made in this section [16-2359(f)] for dismissal without prejudice if the evidence presented does not meet this [clear and convincing] standard. This is because a finding against termination at one point does not mean that termination will not be in the best interest of the child at a later time."). It is not entirely clear, however, that a party could refile a dismissal motion to terminate parental rights, based on exactly the same evidence, without running into *res judicata* or collateral estoppel bars. This legislative history appears to mean that the losing party may refile a motion to terminate based, at least in part, on evidence attributable to the period after denial of the first motion.

tion proceeding. Termination can—and should—be considered without further delay, but the proper way to do so at this point, in the best interest of the child, is in connection with V.V.'s and the E.s' competing petitions to adopt her.

This case is significant for two reasons. First, it presents the question of the role of a separate termination proceeding when an adoption proceeding for the same child—indeed, a contested adoption proceeding—is pending. Second, the case raises the question of the relevance and role, if any, of the child's noncustodial maternal grandparents in a proceeding to terminate the parental rights of the mother. We conclude that, in this case, the proceedings should have been consolidated once V.V., the foster mother (who also is seeking to adopt D.S.), intervened in the termination proceeding. A consequence of V.V.'s intervention was that the court, instead of treating the proceeding exclusively as one for termination of parental rights, permitted evidence and made findings as though contested adoption issues were also before the court. This led—as suggested by the second significant concern here—to an improper focus on the maternal grandparents and a cursory treatment of the fitness of the child's mother herself. As a result, the trial court denied termination because the court apparently thought that the grandparent issue would better be resolved in the adoption proceeding. Thus, this proceeding became neither fish nor fowl—neither termination nor adoption. The better course now is to recognize the problem and to remand for consolidation of all termination and adoption issues, since this will be in the child's best interest.

## I.

D.S. was born July 9, 1986 to T.S., then fifteen years old, who herself had been adjudicated a neglected child in 1985. Because appellant V.V. was acting as T.S.'s foster mother, V.V. was appointed on July 17, 1986 to take care of D.S. as well when the baby girl was eight days old. Both mother[2] and child returned to V.V.'s home after the child's birth, but the mother, T.S., soon left. V.V. has remained the uninterrupted custodian of D.S.

The Department of Human Services (DHS) filed a child neglect petition on July 11, two days after D.S.'s birth, alleging that the mother, T.S., had emotional problems, a history of drug dependency, and abscondences from agency group homes. DHS was concerned that T.S. would disappear with the baby. When D.S. was five months old, the trial court, in accordance with a stipulation signed by the mother, found D.S. to be a neglected child within the meaning of D.C.Code § 16–2301(9)(B) and (C) (1989).[3]

■ In February 1988, V.V., the foster mother, filed a petition to adopt D.S. Ten months later in December 1988, when D.S. was 29 months old, her guardian *ad litem*[4] filed a motion to terminate T.S.'s parental rights. The motion stated that T.S. had not visited D.S. since May 1987, that T.S. was still emotionally unstable and continued to escape from her residential placements

---

2. The role of D.S.'s putative father in the pending neglect and adoption proceedings is unclear. While the neglect petition names a putative father and counsel was appointed for the father, the record does not indicate whether the putative father's rights have been finally adjudicated.

3. D.C.Code § 16–2301 (1989) provides in part:
 (9) The term "neglected child" means a child:
 \* \* \* \* \* \*
 (B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or

(C) whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity; ....

4. The court in the neglect proceeding appointed counsel for the child, D.S., two days after her birth on July 11, 1986. In April 1987, the court ordered the appointment of a guardian *ad litem* who remained counsel for D.S. throughout these proceedings. This guardian *ad litem*, together with counsel for the foster mother, V.V., vigorously protested the way the court conducted the termination proceedings, although he did not join in this appeal.

with her present address unknown, and that she did not wish to avail herself of parenting assistance which DHS had offered. The motion noted that D.S. "continued to grow and thrive in the care of [V.V.]" and that "there are no known relatives who might be suitable for placements for [D.S.]." The accompanying memorandum also noted that the foster mother, V.V., had developed a "warm, loving parent-child relationship" with D.S., [R. 40] while her maternal grandparents, the E.s,

> have expressed an interest in caring for [D.S.] but not on a permanent basis. There has been only occasional contact between [D.S.] and her grandparents and a parent-child relationship has not developed nor has it been attempted.[5]

Two days after this motion was filed, the court ordered the weekly supervised visits between mother and child reduced to monthly visits if T.S. had two consecutive no-shows with less than 24 hours notice of cancellation. Except for one visit in January 1989, T.S. did not visit D.S. from the time the motion to terminate was filed in December 1988 until the termination hearing almost a year later in November 1989. By December 1988, therefore, D.S. was the subject of three proceedings: neglect, ter-

mination of her mother's parental rights, and adoption by the foster mother.[6]

The court issued an interlocutory order granting V.V.'s adoption petition and scheduled a show cause hearing for February 21, 1989 to finalize the order. Counsel for the mother, T.S., moved on February 9 to consolidate D.S.'s neglect/termination proceeding with V.V.'s adoption proceeding.[7] The motion was denied. Then, on February 21, the child's maternal grandparents, the E.s, filed a petition to adopt D.S., which the court consolidated with V.V.'s petition. Given this development, the court then vacated the interlocutory order granting V.V.'s adoption petition.

On April 6, 1989, while the termination motion and adoption petitions were pending, the child's mother, T.S., signed a form consenting to D.S.'s adoption by the grandparents, the E.s (T.S.'s natural mother and stepfather). In doing so T.S. purported to relinquish all her custody, guardianship, and parental rights over D.S. to the grandparents. On June 5, counsel for T.S. moved for reconsideration of her motion to consolidate the neglect/termination proceedings, see *supra* note 7, with the adoption proceedings, arguing that the same evidence [8] would be presented in both cases

5. As early as July 22, 1986, the court appointed counsel to represent the E.s, the maternal grandmother and step-grandfather of D.S., in the neglect proceeding. In March 1987, the court ordered home studies of both V.V. and the E.s. After the studies had been completed, the court in June 1987 continued the placement of D.S. with V.V. but permitted the E.s to have frequent visitation with the child, including overnight and weekends, as determined by the social worker. By May 1989, for reasons not disclosed in the record, the court had limited the grandparents' visits to those that could be arranged at the social worker's office; visits by the E.s to V.V.'s home were prohibited. The number of visits by the E.s and the degree of cooperation offered by the social workers were disputed issues at the termination hearing.

6. A termination of parental rights proceeding can occur either as part of an adoption proceeding, *see In re D.R.M.,* 570 A.2d 796, 804–05 (D.C.1990), or as a dispositional alternative in a neglect proceeding. *See* D.C.Code § 16–2320(a)(6) (1989) (if a child is found to be neglected, the Family Division may terminate parental rights for the purpose of seeking an adoptive placement of the child); Su-

per.Ct.Neg.R. 18(c) (Family Division may order permanent termination of parental rights as a dispositional alternative in a neglect case). In this case, termination took place within the neglect proceeding. While technically termination was a dispositional alternative for D.S. as a neglected child, it was a "separate and distinct" factfinding proceeding, *see In re A.W.,* 569 A.2d 168, 172 (D.C.1990), governed by unique statutory provisions for providing notice, determining the eligibility of parties, conducting hearings, and deciding the merits. *See* D.C.Code §§ 16–2356 to –2359 (1989).

7. Because the motion to terminate the mother's parental rights was a dispositional alternative in the child's neglect case, see *supra* note 6, the motion to consolidate requested joinder of the entire neglect/termination case with the adoption proceeding, even though the neglect and termination proceedings had different rules for joining parties. See *infra* note 8.

8. While the court in the neglect proceeding appointed counsel for the E.s on July 22, 1986, see *supra* note 5, the court vacated this order on March 22, 1989 because D.C.Code § 16–2304

and that, regardless of the outcome of the termination proceeding, adoption proceedings would be necessary. The foster mother, V.V.—who was a party in both the neglect and the adoption proceeding, but not in the termination proceeding at that point—opposed the motion on the grounds that these proceedings did not involve the same parties (because the E.s were not parties to the neglect/termination proceeding, see *supra* note 8, and she was not a party to the termination), and that it was too much to ask V.V. to oppose both a hostile mother and hostile grandparents in the same adoption proceeding. V.V. also argued that the neglect/termination and adoption proceedings were fundamentally different: the former focused on the mother's behavior and relationship with her child, while the latter focused on which of two parties should be allowed to adopt the child. The court denied the motion to reconsider on June 19, 1989. On July 13, 1989, V.V., already a party to the neglect proceeding, filed a motion to be joined as a party to the termination proceeding pursuant to D.C.Code § 16–2356.[9] The court granted the motion a month later. The E.s did not file a motion to intervene in the termination proceeding, and the court did not name them as parties on the court's own motion.

On August 24, 1989, the child's mother, T.S., moved to continue the termination proceeding because she was incarcerated on a solicitation for prostitution charge and had a trial date on the same date as the scheduled termination hearing.[10] Finally, on November 24, 1989, the court held the termination hearing.

In opening argument, the guardian *ad litem* for D.S. argued that this was a simple case of abandonment of a child by a teenage mother who had emotional and mental problems and had not shown any interest in rearing her child. Counsel for T.S., however, replied that the natural family had not abandoned D.S. Counsel stressed that

> this mother is at this point ready to take her child, wants to take her child, wants her child to be with her parents, has consistently expressed that since 1987 and that this family, this natural family is ready, willing and able to take care of this child, and that that sense of identity that a child would have with the natural family—who is my mother, who are my grandparents—is a profound one and one that this Court has considered.

Counsel for T.S. also charged the social workers with prejudice in favor of the foster mother (V.V.) and against the natural mother (T.S.) and the maternal grandparents (the E.s).

Ms. Smith, the social worker who had worked with the child's mother, T.S., since April 1986, testified that T.S. had a history of drug usage, of emotional instability, and of running away from her own home and from agency placements. She explained how T.S., on learning she was pregnant, had asked to live with V.V., who was a friend of the family and was someone T.S.

permits the court in a neglect proceeding to appoint counsel only for "the child and his [or her] parent, guardian, or custodian," or for a person with whom the child has been living or who has been named a party to the proceeding. *See* D.C.Code § 16–2304(a) and (b)(3) (1989). In this case, the child had never lived with the E.s nor had the E.s been appointed as the child's guardian or custodian. Therefore, the E.s were not parties to the neglect proceeding at the time the motions to consolidate the neglect/termination and adoption proceedings were filed. The court's ruling that vacated appointment of counsel for the E.s in the neglect proceeding would not have barred them from receiving court-appointed counsel if the court, in its discretion, had named them as parties to the termination proceeding under § 16–2353. See *infra* note 9.

9. D.C.Code § 16–2356 (1989) permits the judge to join additional parties at his or her discretion. It states:

> Parties to a proceeding for the termination of the parent and child relationship shall be the child, the parent of the named child, and the agency having the legal custody of the child. The judge may at his or her own discretion, name on his or her own motion or in response to a motion for joinder or intervention, join additional parties to a proceeding to terminate the parent and child relationship.

10. At the criminal proceeding on October 24, 1989, T.S. pled guilty to a violation of the Bail Reform Act, was placed on one year of probation, and was ordered, as a condition of probation, to live with her mother for one year and to enroll in a high school equivalency program.

believed would be willing to take care of her. T.S. preferred not to live at home because "she said she could not get along with her mother" and her stepfather "would physically discipline her." Ms. Smith noted that between 1986 and 1989, she had had over 66 contacts with T.S., many of them casual run-ins on the street, in an alley, or at a store, and had discussed with her the need to plan for D.S. and to follow court orders so that she could avoid termination of her parental rights. In those three years, however, T.S. had visited her child once in January 1989 accompanied by her stepfather; had attended only one of the five visits arranged for her in 1988; and, between May 1987 and March 1988, had not visited her child because T.S. had been placed in a residential treatment facility in Florida (from which she eventually had absconded). Ms. Smith also testified that she had personally asked the E.s if they would take D.S. at birth, but that they had refused because Mr. E. "did not want the child in the house with ... his own kids and he thought that [T.S.] was a problem, and he felt [T.S.] should be somewhere else." On cross-examination, counsel for T.S. did not challenge the facts presented about T.S. but questioned Ms. Smith about the accuracy of her recording the visits by the E.s. On rebuttal, the court inquired at great length (15 pages of transcript) into the services Ms. Smith had offered the E.s. Ms. Smith replied that she had offered Mrs. E. individual therapy and parenting classes but that Mrs. E. had refused them. Therapy for the E.s and T.S., as a family, had been provided by the residential centers where T.S. had been placed.

Dr. Wynne, a clinical psychologist, testified that he had tested T.S. in 1986 when she was fifteen and had found she was borderline retarded in her verbal scores and retarded in her scores on hand/eye coordination and spatial orientation. Academically, T.S. tested in the third to fourth grade level. T.S. had difficulty with sequencing, a learning disability that would make it hard for her to get her life in order, to keep track of her possessions, to keep appointments, and to learn to read. When asked whether T.S. could have changed in the three years since he evaluated her, Dr. Wynne replied that he knew "of no remedial program anywhere in this country that in three years could change that child dramatically." He further testified that T.S.'s learning disability was complicated by serious emotional problems, poor impulse control, and a low self-image in part because she had been sexually abused by her birth father and because her mother had not believed her claim.[11]

Dr. Wynne also tested D.S., V.V., and the E.s in 1987 as part of a court-ordered home study. See *supra* note 5. He found that D.S. was "a nifty kid. She was real, real bright, extremely pretty, obviously very well cared for, emotionally secure, competent child." He testified that "we were very impressed with [V.V.]. She seemed ... a wise woman." Concerning V.V.'s relationship with D.S., Dr. Wynne reported that "[i]t was terrific ... a parent/child relationship at its best." Regarding Mrs. E., Dr. Wynne testified that he was concerned that her relationship with T.S. mirrored her own childhood trauma in which she had been sent away by her own family to live with a difficult birth father. Dr. Wynne concluded that Mrs. E. seemed to have little awareness of the depth of trouble T.S. was experiencing. He testified that Mrs. E.'s assessment in 1987 that T.S. would have her life together in a year or so was very inappropriate and revealed that Mrs. E. did not see T.S. or T.S.'s relationship with D.S. with realism and clarity. He also testified that in 1987 Mrs. E. had not

11. Dr. Wynne testified that when T.S. was nine years old, she told her mother she had been raped by her birth father. Her mother, however, not only did not believe T.S. but also sent her at thirteen years of age back to live with her father in California until he could escort her to a residential program in Oklahoma. In the interim, T.S. had become a chronic runaway, causing her mother to decide that she needed to be sent away. Mrs. E. testified that she did not consult with any health professional regarding her decision to send T.S. to California. The birth father, however, further sexually abused T.S., who then ran away from her father and was placed in a series of group homes in California from which she absconded. Mrs. E. testified that T.S.'s father was serving time in jail for sexually molesting T.S.'s sister.

wanted to adopt D.S.; she had just wanted custody because she viewed D.S. as T.S.'s ultimate responsibility. On cross-examination, Dr. Wynne agreed that Mrs. E. was an intellectually capable woman with a warm and stable relationship with her husband, T.S.'s stepfather. Mrs. E. also had a steady government job and a relaxed relationship with her two stepchildren by her marriage to Mr. E.

V.V., the foster mother, then testified. She said she had first met T.S. and the E.s in 1983 when they lived in the same apartment building where V.V. continues to reside. T.S. began to live with V.V. in October 1985 when T.S. first learned she was pregnant and wanted someone she could confide in. After D.S. was born, however, T.S. stayed with V.V. for only one day. According to V.V., T.S. visited with D.S. only six times between birth and the termination hearing. These visits totaled about twenty hours. In the summer months before the November 1989 termination hearing, V.V., accompanied by the child, had four or five casual contacts with T.S. on the streets of her neighborhood. The conversations, however, had lasted about a minute or two, and T.S. had never inquired about D.S. or expressed an interest in visiting her child. When V.V. asked T.S. why she did not visit her daughter, T.S. "just backed off and went away." V.V. further testified that the E.s, at first, had visited V.V.'s home approximately 20 times under arrangements made by the social worker. Later, the court changed the visitation procedure so that visits were allowed only at DHS offices and in V.V.'s presence. On cross-examination, V.V. explained that she had not worked for six years because she had a back injury, that she had applied for disability, that her twenty-year-old daughter lived with her, and that she had not requested, but did receive, the services of a respite worker who gave her time off from her parenting responsibilities.

Ms. Pitman, a respite worker for Lutheran Social Services, testified that she had been sent to V.V.'s home in November 1986 in order to provide respite services for T.S., who had been placed with V.V. However, she never saw T.S. during her 75 visits to V.V.'s home. She also testified that D.S. refers to V.V. as "mother" and that D.S. has "grown beautifully" under V.V.'s care. At the time of the hearing, Ms. Pitman provided respite care to V.V. at least once every two weeks.

Ms. Bowman, a social worker at the hospital where D.S. was born, testified that T.S. had asked her mother, Mrs. E., whether she could come home to the E.s with baby D.S. Mrs. E. had refused to take D.S. because she had never gotten along with T.S. and "had her two kids and her new husband" to look after.

T.S.'s counsel called as her first witness Pastor Adams of the Word of Life Church of God in Maryland, who was questioned about his knowledge of the E.s. He testified that the E.s had been members of his church for six years and were currently directors of the children's program. Counsel for V.V. objected to the relevance of this evidence in a termination proceeding, arguing it should be admitted only at an adoption proceeding. The court sustained the objection. The Pastor characterized the relationship between T.S. and her parents as a challenging and tough relationship. "They've tried to keep her in the home, they've tried to provide a good home for her." He also noted that T.S. attended the church youth group regularly. He was unaware, however, that T.S. had been previously adjudicated a neglected child. The court sustained objections when counsel asked if he had knowledge of T.S.'s recent criminal record.

T.S.'s next witness was her stepfather, Mr. E., whose testimony in part supported that of Ms. Smith, the social worker. He stated that the E.s did not take custody of D.S. when she was born because they were having problems with T.S.; their family was "in chaos, you know, because [T.S.] was going through some experiences as far as molestation"; and they needed temporary help so that they could "piece our family back together." When asked about T.S.'s sexual abuse, Mr. E. replied twice, "It's like the little boy who cried wolf, you

know, like that." [12]

Mr. E. testified at length about how difficult the court and Ms. Smith had made visitation for them after the court cut off visits at V.V.'s home. Mr. E., however did recall that he had a court-appointed attorney to assist him through the process. He also testified that T.S. was currently stable, going to church regularly, and "[was] not the same person she was in 1986." When counsel for V.V. tried to elicit from Mr. E. whether he knew why T.S. was currently on probation or why she had previously been ruled a neglected child, the court ruled the questions irrelevant.

The last witness for T.S. was her natural mother, Mrs. E., who testified that T.S. "has been a most difficult child, running away on a daily basis—and being really out of control." Mrs. E. often did not know where T.S. was staying; nor did she always know where her other daughter was living. Mrs. E. testified that she had not let T.S. come home in 1986 with her new baby because the E.s needed professional help to put their family back together again. "We didn't want [T.S. and D.S.] to come into our home and have a lot of problems that would be too upsetting...." Mrs. E. explained that the social worker had asked her to take the baby alone but that she had refused because she had wanted D.S. and T.S. to establish a bond. She further testified that she believed D.S.'s foster placement was temporary, and she claimed that she had no knowledge of V.V.'s adoption petition until it was nearly final. On cross-examination, however, Mrs. E. acknowledged that she had been present at court hearings in 1988 when V.V.'s adoption petition had been discussed.

Like her husband, Mrs. E. testified at great length that the social worker had been uncooperative, had made it difficult for them to arrange visits with D.S., and would not let them have overnight visits with D.S. when their daughter was in town for fear that T.S. would abscond with the baby. She also testified that her court-appointed lawyer had not helped them but that she had not asked for a different lawyer.

When asked about the quality of her interaction with D.S. during her visits, Mrs. E. explained that V.V. would remain present:

> [V.V.] would try to leave out sometimes, and the baby, you know, would want her to stay, and I have to be very honest about that.

Mrs. E. also stated that she did not make any financial contribution through the social service agencies to help D.S.

Finally, when describing her past relationship with her daughter, T.S., Mrs. E. testified that "we had a very good relationship. She would always talk to me." Mrs. E. described T.S. in 1989 as "stable. She's not as angry as she used to be, and she's cooperative," often going to church with the E.s on Friday nights and all day Sunday. On cross-examination, however, Mrs. E. explained that even in the past six months T.S. has been away from the house overnight without her parent's knowledge. She also acknowledged that in the past six months T.S. had been arrested for soliciting for prostitution, for "talking to some policemen or something." While Mrs. E. knew that one condition of T.S.'s probation was to stay at the E.s' home, see *supra* note 9, Mrs. E. did not understand what would happen to T.S. if she violated her probation. "I don't know what happens. I don't know the court procedures."

---

**12.** Regarding T.S.'s sexual abuse when she was nine years old, Mr. E. testified:

> [T.S. was] just like the boy who cried wolf. When it first happened, T. told us it first happened in details, okay? So my wife and I said, well, if we're going to accuse somebody of something like this, we better be very sure. So we sat down and talked it over with T. So we made a move to put our finger on the dials and call the authorities. We got the phone call ringing. T. said she just made that up. So we put the phone down.

Mrs. E. also characterized T.S. at age nine as someone "crying wolf" at the time of her sexual molestation. Mrs. E. testified:

> [T.], at that time, was in the habit of saying yes, it happened; no, it didn't happen. When she was pushed against the wall, she would always play head games with us because she was very manipulative at that time.

T.S. did not testify, although she was present in the courtroom for the two days of the termination proceedings.

In closing, the child's guardian *ad litem* and counsel for V.V. both argued that they had satisfied statutory requirements, presenting clear and convincing proof that T.S. did not have the ability or the desire to raise her child. They also argued that T.S. had presented no testimony or other evidence that she wanted to take custody of her child. In contrast, counsel for T.S. argued that termination would harm D.S. and would "totally and permanently" cut her off from her natural grandparents. In addition, counsel for T.S. argued that the termination statute mandated family reunification and that, in this case, the social service agency had simply not done enough to reunify the grandparents with D.S. Finally, counsel for T.S. argued that granting termination would serve no point and that the decision to terminate T.S.'s parental rights should be left to the adoption proceeding.

On December 11, 1989, the trial judge issued his findings of fact and conclusions of law denying termination of T.S.'s parental rights without prejudice. In his findings of fact, the judge considered the termination statute, D.C.Code § 16–2353(b), which sets forth the factors to be considered. The judge found:

9. Guidance in termination of parental rights proceedings is given to the Court most recently in [*In re A.B.E.*, 564 A.2d 751 (D.C.1989) ].... The Court specifically addressed the issue of how would a child be hurt or helped by the granting of a termination of parental rights or how a child would be hurt or helped by a denial of a termination of parental rights.

\* \* \* \* \* \*

12. The statute does not elevate the grandparents of a child over any other person. The statute does not treat juvenile mothers differently than adult mothers. In the context of what happens in the District of Columbia this is a lack in the statute.

\* \* \* \* \* \*

15. The Court finds that the natural mother has had the ability to visit the child but has minimally visited.

16. However, the statute does not consider all the real situations which occur when juvenile mothers are involved in matters such as presented by the instant case, specifically, the practical role which grandmothers play in the birth family's home and in many homes in the District of Columbia. Thus, the role of the grandparents cannot be overlooked in considering what is in the best interests of the child.

\* \* \* \* \* \*

18. Of paramount importance to the Court is how the child will be helped and the Court is distressed that the Court did not hear sworn testimony from [T.S.], the natural mother. The Court did, however, hear arguments presented by counsel for [T.S.] and credits [T.S.]'s presence in Court for the two days of the hearing and believes that [T.S.] has an interest in the outcome of this matter. The Court will not hold [T.S.]'s lack of testimony against the child whose interests are paramount.

\* \* \* \* \* \*

20. [V.V.] has done an extremely good job for the [E.] family and, particularly, for [T.S.], in caring for [D.S.]. [V.V.] was present when the parties in this matter needed her. [V.V.] does have physical and medical problems and is currently on medications and no longer works. However, [V.V.] has provided more than adequate care for [T.S.] when she needed it as well as for [D.S.].

21. ... Both Mr. and Mrs. [E.] have expressed a sincere interest in D.S. and the Court credits that interest.... The court credits the evidence presented which demonstrated that the [E.s] sent letters to DHS and made aggravated telephone calls to DHS expressing their desire to maintain a relationship to [D.S.] Due to the fact that [T.S.] was fifteen when she gave birth to [D.S.], [T.S.] did not have the capacity to appropriately

parent [D.S.] However, the grandparents have acted as a resource for [T.S.]

The Court concluded as a matter of law:

23. As to factor number one, if the Court were to grant the termination of parental rights the child's need for continuity of care will remain the same and the child would remain with [V.V.] ... [T]here is no advantage to the child to terminate parental rights at this point in time and, in fact, may be a disadvantage as the child would never get to know her natural mother.

24. As to the second factor, the child is a healthy child and does not experience any mental health concerns.... [V.V.] has coped with her physical disability in the past and would be able to care for [D.S.] in the future ...

25. As to factor number three, the quality of interactions, the child will still be placed with the foster parent. If the termination of parental rights were to be granted, such an action would dissolve the relationship between [D.S.] and [T.S.] and will also dissolve the relationship between [the E.s] and [D.S.]; such an action would leave [D.S.] with no practical hope of ever being reunified with her natural family.

26. As to the fourth factor, the child has not been presented to the Court. Although some evidence exists that the child calls her foster parent "mother" the Court finds that the child is too young to make a determination as to her own best interests in this matter.

27. This case is a case which got away from the Department of Human Services. As cases continue on in the neglect system reunification ought to be an issue which is discussed repeatedly, otherwise we will find ourselves as a civilization with no families.

28. Based on all of the factors ... the Court finds that the child would be harmed by the granting of the motion for termination of parental rights and will not be harmed by the denial of said motion. The harm in this matter would be the irrevocable dismissal of the chance for [D.S.] to know her birth family.

Consequently, the court denied the motion by D.S.'s guardian *ad litem* to terminate the parent and child relationship between T.S. and D.S.

## II.

■ "The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling." *E.C. v. District of Columbia*, 589 A.2d 1245, 1249 (D.C.1991) (quoting *In re A.B.E.*, 564 A.2d 751, 754 (D.C.1989)). The termination statute requires the trial court to consider five factors in determining the child's best interest:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home.

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parent;

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and

(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided....

D.C.Code § 16–2353(b) (1989 & Supp.1990). The court is to construe these factors liberally in order to promote the general purposes of the termination statute: to encourage stability in children's lives, to ensure recognition of all parties' constitutional rights, and to "increase the opportunities for the prompt adoptive placement of children for whom parental rights have been terminated." *Id.* § 16–2351(a) and (b).

■ "Proofs made in a termination proceeding must satisfy the clear and convincing evidentiary standard." *In re K.A.*, 484

A.2d 992, 995–96 (D.C.1984) (citing D.C.Code § 16–2359(f) and *Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982)). Thus, the moving party has the burden of supplying clear and convincing proof that termination of parental rights would be in the child's best interest. *See A.B.E.*, 564 A.2d at 755. In reviewing a termination proceeding, this court "must be satisfied 'that the possibility of an erroneous judgment does not lie in equipoise between the two sides'; that is, that the likelihood of an erroneous decision would be greater if the trial court elected not to terminate parental rights." *Id.* (quoting *K.A.*, 484 A.2d at 996). We will reverse only for abuse of discretion after

> we check to be sure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor. *See Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979). We then evaluate whether the decision is supported by "substantial" reasoning, *id.*, "drawn from a firm factual foundation" in the record. *Id.* at 364.

*Petition of R.M.G.*, 454 A.2d 776, 790 (D.C.1982).

Appellant V.V. argues that the trial court abused its discretion in applying the § 16–2353(b) factors and misapplied our decision in *A.B.E.*, a case (unlike this one) where we reversed a termination of parental rights because the child had only a "marginal" chance of adoption. *Id.*, 564 A.2d at 756.

### A.

■ The second factor under the termination statute, § 16–2353(b)(2), requires the trial court to consider "the physical, mental and emotional health of *all* individuals involved" (emphasis added). Appellant V.V. claims the trial court abused its discretion by failing to make findings on the mother's (T.S.'s) mental, physical, and emotional health as required. We agree.

In discussing the findings a trial court must make on this second factor, the legis-

lative history of the termination statute [13] reveals that a parent's "health" or "fitness" in the abstract will not in itself determine whether termination is in the child's best interest; rather, the focus must be on how well the parent, despite significant problems, can meet the particular needs of the child. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON TITLE IV OF BILL NO. 2–48, "THE PREVENTION OF CHILD ABUSE AND NEGLECT ACT OF 1977," at 24 (March 29, 1977) (COUNCIL REPORT). Here, the trial court made findings about the child, D.S., and the foster mother, V.V., but completely failed to state any findings about the mother, T.S. The court ignored the uncontroverted testimony that T.S. suffered significant mental and emotional problems, had recently been arrested for solicitation for prostitution, and had expressed no interest in caring for or even visiting her child. On this record, therefore, we cannot say the trial court's analysis, virtually ignoring the very parent whose rights are at issue, was "substantial" and rested on a "firm factual foundation." *R.M.G.*, 454 A.2d at 790.

### B.

Appellant also contends the trial court abused its discretion in applying the third, § 16–2353(b)(3) factor—"the quality of interaction and interrelationship of the child with his or her ... relative"—by inserting a new factor, the grandparent factor, into the "best interest of the child" analysis. Appellant adds that, in doing so, the court relied on incorrect facts and, as a consequence, made erroneous conclusions of law. In particular, appellant cites findings of fact 12 and 16:

12. The [termination] statute does not elevate the grandparents of a child over any other person. The statute does not treat juvenile mothers differently than adult mothers. In the context of what happens in the District of Columbia *this is a lack in the statute.*

\* \* \* \* \* \*

---

13. The Council of the District of Columbia enacted § 16–2353(b) in 1977 as part of Title IV of

the Prevention of Child Abuse and Neglect Act of 1977, D.C.Law 2–22.

16. ... [T]he statute does not consider all the real situations which occur when juvenile mothers are involved in matters such as [are] presented by the instant case, *specifically, the practical role which grandmothers play in the birth family's home and in many homes in the District of Columbia.* Thus, the role of the grandparents cannot be overlooked in considering what is in the best interests of the child.

(Emphasis added.) Appellant then claims error in conclusions of law 25 and 28, holding that termination

*would dissolve the relationship between [the E.s] and [D.S.];* such an action would leave [D.S.] with no practical legal hope of ever being reunified with her natural family.... The harm [in granting termination] would be the *irrevocable dismissal of the chance for [D.S.] to know her birth family.*

(Emphasis added.)

■ Counsel for T.S. replies that the third statutory factor requires the court to inquire into the quality of the relationship between the grandparents and the child, in order to assess any obstacle the social service agencies may have placed in the way of the grandparents' visitation, and to evaluate the services the government provided to assist in reunification of the natural family unit.[14] Counsel for T.S. also argues that the termination statute was designed as a flexible decision-making framework. This is so, counsel says, because "the best interest standard 'does not contain precise meaning,' ... 'and cannot operate with pinpoint precision.'" *Petition of D.I.S.,* 494 A.2d 1316, 1325 (D.C.1985) (citations omit-

ted). Therefore, according to counsel for T.S., "each case must be dealt with on its own terms," *id.,* and since T.S. herself was only fifteen years old when D.S. was born, it was not improper for the court to assign increased weight to the quality of interaction between D.S. and her maternal grandparents in deciding not to sever T.S.'s parental relationship.

■ While the trial court does have considerable discretion in applying the statutory factors in § 16–2353(b), the court is not free to change the statute. Here, we read the court's findings 12 and 16 and conclusions 25 and 28, quoted above, as not only questioning the adequacy of the statute itself but also, as a result of that perceived inadequacy, applying the statute more flexibly than its language permits. More specifically, the trial court, in effect, substituted the grandparents for their teenage daughter, T.S., and considered the merits of the termination proceeding as it related to the grandparent-child relationship, not to the mother-child relationship. We find nothing in the statute or in its legislative history that permits the court to conceptualize a termination proceeding by substituting the grandparents for a parent, even if the parent herself is a juvenile.[15]

■ We are not saying that the trial court, in considering the best interest of the child, cannot factor into the decision whether to terminate parental rights the support a grandparent is likely to give the natural parent; we agree that the support system provided by members of the child's extended family is relevant—and, indeed,

14. We have recently noted that the District of Columbia does not have a statutory duty to provide reunification services to natural parents of neglected children. *See In re D.G.,* 583 A.2d 160, 168 (D.C.1990). This does not mean, however, that in deciding the merits of a motion to terminate parental rights the trial court should not "explore every avenue of reconciliation between child and parent." *Id.* at 165. Reconciliation of the extended family, however, is beyond the focus of the termination of parental rights hearing.

15. The statute is clear: the focus of a termination proceeding is "the parent and child relationship," D.C.Code §§ 16–2351 to –2365, not

the grandparent and child relationship. Buttressing this language, the COUNCIL REPORT stresses that primary consideration should be placed on "the child's needs and well being ... [and] the ability of [the] parents to meet the needs of the child." COUNCIL REPORT at 24. *See also Appeal of H.R.,* 581 A.2d 1141, 1156 (D.C.1990) ("In contrast to the adoption statute, ... the termination statute continues to focus on the capabilities of the natural parent, thereby allowing that parent to defend against attacks on his or her capabilities wholly apart from, and not in comparison with, other custodians or potential adoptive parents.")

often very important—in deciding whether the natural parent is capable of meeting the child's particular needs. But this is quite different from saying that, in the case of a teenage parent, the parent and the grandparents are presumptively a team, and that unless the grandparents are themselves manifestly incapable of parenting the grandchild, the rights of the natural parent, with whom the grandparents presumptively have an effective working relationship, cannot be terminated.

After reviewing the entire record and the trial court's findings and conclusions, we believe the court took this latter approach here. There is no other way of explaining the complete lack of findings and conclusions about T.S., see *supra* Part II.A., and the inordinate focus of the trial court's order on the implications of termination on the relationship between the child (D.S.) and her grandparents. The trial court simply ignored the evidence that T.S. herself was a neglected child and a chronic runaway who, while living with her parents (the E.s), was arrested for soliciting for prostitution two months before the termination hearing. Necessarily, therefore, this means the trial court was ruling, by implication, that whatever T.S.'s inadequacies as a parent were, the child's grandparents had parental rights on T.S.'s behalf—as her surrogate at law—which could not be terminated in the child's best interests.

■ This ruling is erroneous. The termination statute expressly limits the effects of a termination decree to the parent specified:

An order terminating the parent and child relationship divests the parent and the child of all legal rights, powers, privileges, immunities, duties and obligations with respect to each other, except the right of the child to inherit from his or her parent. The right of inheritance of the child shall be terminated only by a final order of adoption.

D.C.Code § 16–2361(a). On its face, therefore, the termination statute has no effect on whatever legal rights grandparents may have in a child's future.[16]

Moreover, the Council itself, in its report accompanying the termination legislation, made clear that the only parental rights at issue under the statute are those of the natural parent. The Council was aware that termination is likely to interfere with some extended family relationships but made clear that this consideration should not govern a court's decision to terminate parental rights. *See* COUNCIL REPORT at 24. Specifically, the Council stressed—contrary to the trial court's understanding in conclusion 28—that termination of parental rights would not necessarily cut off a child's access to her grandparents. The COUNCIL REPORT explained:

While important, termination need not necessarily be denied in order to preserve relationships with siblings and the extended family—or even in some rare cases with natural parents who are unable to assume parental responsibilities for the child. In current practice, adoption does not, as in the past, necessarily mean the severance of all contacts with natural relatives ... [who] share strongly positive and reciprocal ties with the child. Such contacts may be beneficial in some cases and can be accepted by many adoptive parents.

COUNCIL REPORT at 24. Consistent with modern practice, the Council apparently assumed that courts could find ways, as in

---

**16.** Unlike many jurisdictions, the District of Columbia does not explicitly grant visitation rights to grandparents in either a neglect or a termination proceeding. *See, e.g., In re Adoption of Hess,* 386 Pa.Super. 301, 562 A.2d 1375, 1377 (1989) (relying on statutory visitation right of grandparents); Note, *The Constitutional Constraints on Grandparents' Visitation Statutes,* 86 COLUM.L.REV. 118, 119 (1986). D.C.Code § 16–2310(d) (1989) permits at least weekly visitation of children in shelter care by "the child's parent, guardian or custodian" unless such visitation rights would create "an imminent danger to or be detrimental to the well-being of the child," *id.* That statute does not mention grandparents. Here, the court in the neglect proceeding had nonetheless granted visitation to the non-custodial grandparents early on in the proceeding, and no one has suggested that visits by the grandparents could not have continued if the

other jurisdictions,[17] to mitigate the harsh effects of termination on extended family relationships. See *supra* note 15.

■■ Accordingly, contrary to the trial court's conclusions 25 and 28, termination of T.S.'s parental rights would not have "dissolve[d] the relationship between D.S. and [her grandparents]" and thus would not have resulted in the "irrevocable dismissal of the chance for [D.S.] to know her birth family." Furthermore, at the time the trial court ruled on termination, the grandparents had filed a petition to adopt D.S. This petition could still be granted even if the court terminated T.S.'s parental rights. *Cf. D.I.S.*, 494 A.2d at 1320 (upholding adoption petition of noncustodial natural grandmother over neglected grandchild after mother's death). In sum, the trial court erred in withholding termination, in part, on the assumption that grandparents' rights would be impermissibly affected.[18]

### C.

In addition to the difficulties with the § 16–2353(b)(2) and (3) factors, the trial court expanded this termination proceeding, in effect, to encompass aspects of the pending adoption proceeding. In adverting to D.S.'s prospects for adoption, the court did not merely resolve whether they were better than "marginal." *A.B.E.*, 564 A.2d at 756.[19] Rather, the court concluded that *A.B.E.* required it to consider "all options for adoption" and to judge how termination

of parental rights "would play out" in the adoption proceeding. The court elaborated: "I have got to consider what would happen [in the adoption case] if I didn't terminate rights and what would happen if I did terminate rights and balance out the two, and if I find that I am ... less likely to commit error if I don't terminate rights, then that is what I have got to do." The court added that its analysis must be "far broader than just the issue of whether or not chances of adoption will be enhanced." Consequently, as the statement of facts and proceedings makes clear, see *supra* Part I, the trial court permitted—over objection of V.V. and the child's guardian *ad litem*—the admission of extensive testimony regarding the E.s' lifestyle, their degree of interest in D.S., and the role of DHS in providing reunification services for T.S. and the E.s.

Appellant V.V. contends that the trial court erred in interpreting *A.B.E.* to require broad inquiry into the suitability of the prospective adoptive family or families before granting termination of the mother's parental rights. According to V.V.'s counsel, *A.B.E.* required the court to make no more than a simple finding that, because two adoption petitions had been filed, the child's prospects for adoption were better than "marginal," *A.B.E.*, 564 A.2d at 756—that indeed they were excellent.

■■ Counsel for the mother, T.S., replies that this case is unusual because

---

parental rights of the mother, T.S., had been terminated (an issue we do not resolve).

**17.** *See, e.g., In re Guardianship of Marino,* 30 Cal.App.3d 952, 106 Cal.Rptr. 655 (1973) (awarding custody to maternal aunt who had cared for child for six years with visitation to natural father); *Michaud v. Wawrick,* 209 Conn. 407, 551 A.2d 738 (1988) (natural parents contract with adoptive parents for continued visitation rights not void as against public policy); *In re V.B.,* 229 Mont. 133, 744 P.2d 1248 (1987) (contact with child, as distinguished from visitation, granted mother whose parental rights had been terminated); *Bennett v. Marrow,* 59 A.D.2d 492, 399 N.Y.S.2d 697 (1977) (awarding custody to caretaker of eight years, with visitation to natural mother); *Reflow v. Reflow,* 24 Or.App. 365, 545 P.2d 894 (1976) (awarding permanent custody to relatives who had provided care during most of five year period, with visitation to natural parents).

**18.** V.V. also contends the trial court failed to apply correctly the first statutory factor, "the child's need for continuity of care and timely integration into a stable and permanent home." D.C.Code § 16–2353(b)(1). Having found other reasons to reverse and remand, we decline to consider this issue.

**19.** In *A.B.E.,* we balanced the "minimal possibilities of adoptive placement" of a twelve-year old learning disabled boy whose foster parents did not wish to adopt him against the "stabilizing influence, and the sense of identity, that some continuing legal relationship" with his natural father would bring. *Id,* 564 A.2d at 757. We concluded that no substantial good would be achieved by terminating the father's rights because it "would only cast A.B.E. further adrift." *Id.*

T.S. has consented[20] to adoption of her child by her parents' (the E.s'), but not by V.V.[21] Counsel stresses that only V.V. would gain by termination, as termination would negate that consent. *See* D.C.Code § 16–2361(b).[22] Counsel for T.S. accordingly contends that because termination could profoundly affect the adoption proceeding, the trial court acted correctly in considering the implications of termination on the competing adoption petitions.[23]

 Counsel for V.V. is correct in stressing that, by virtue of the two pending adopting petitions, D.S.'s prospects for adoption are substantial, in contrast with the prospects of the 12–year–old boy in *A.B.E.* Thus, we agree with V.V. that on this record the court could not properly decline to terminate T.S.'s parental rights on the ground that the child's prospects for adoption are insufficient or "marginal." *Id.*, 564 A.2d at 756. The trial court, however, twisted *A.B.E.* into a license to premise denial of termination very substantially on an evaluation of the impact of its deci-

sion on the adoption proceeding, not—as in *A.B.E.*—on how the prospects for adoption should affect the termination proceeding. Although the court did have a responsibility under *A.B.E.* to evaluate the child's prospects for adoption, the court ultimately got things backward. The court erred in making the termination decision itself substantially by reference to how termination would affect a concurrent contested adoption proceeding but without considering all the relevant adoption issues through a consolidated termination/adoption proceeding. We do not need to resolve how far, in light of *A.B.E.*, a termination proceeding may proceed apart from an ongoing adoption proceeding.[24] Whatever those outer limits may be, we are satisfied the trial court exceeded them here.

\* \* \* \* \* \*

 Ordinarily, faced with a termination proceeding not free from harmful error, we would remand for a new termination hearing.[25] For reasons that follow,

---

**20.** Even if a birth mother consents to adoption, the court would have to terminate the parental rights of the putative father (unless he, too, consents). See *supra* note 2; D.C.Code § 16–304(b)(2)(A)(e) (1989); *Appeal of H.R.*, 581 A.2d 1141, 1156–57 (D.C.1990).

**21.** Counsel for T.S. also argues that only the adoption court should consider the validity of T.S.'s consent and thus that termination of T.S.'s parental rights would be inappropriate because it would invalidate her consent. This argument begs the question, however. The only way for the adoption court to evaluate T.S.'s consent would be for it to hear the very evidence presented at the termination hearing. It would be an obvious waste of judicial time and energy if termination courts were estopped to terminate parental rights merely because the parent had attempted to consent to adoption by one of the parties to a pending adoption proceeding. Accordingly, as long as separately pending termination and adoption proceedings as to the same child are possible under present law, it is proper for a termination court to evaluate a parent's relationship with the child and thus to decide whether that parent should retain the right to influence the child's future—including the parental right to consent to the child's adoption. *See* D.C.Code § 16–304 (1989) (consent to adoption; *id.* § 16–2361(b) (termination of parental rights forecloses right of parent whose rights are terminated to notice of adoption proceedings), *infra* note 21.

**22.** D.C.Code § 16–2361(b) (1989) provides:

(b) When an order terminating the parent and child relationship has been issued, the parent whose right has been terminated shall not thereafter be entitled to notice of proceedings for the adoption of the child by another nor shall such parent have any right to object to the adoption or otherwise to participate in the proceedings.

**23.** We note that nowhere in the transcript or in its findings of fact or conclusions of law did the trial court explicitly consider the fact that T.S. had consented to the E.s' adoption of D.S.

**24.** We have made clear that a pending adoption petition is not a prerequisite to termination of parental rights. *See E.C.*, 589 A.2d at 1251 (termination appropriate even though "no adoptive placement ha[s] in fact been made or even identified"); *In re A.W.*, 569 A.2d 168, 172 (D.C.1990) (termination statute does not require DHS to identify prospective adoptive parents before parental rights can be terminated if child is very suitable for adoption).

**25.** "The right of a natural parent to raise one's child is a fundamental and essential one which is constitutionally protected," *Matter of Adoption of J.S.R.*, 374 A.2d 860, 863 (D.C.1977); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), and termination of parental rights requires clear and convincing evidence. *See* D.C.Code § 16–2359(f)

however, we do not take that course of action now.

### III.

In deciding upon a remedy, we have to consider whether the situation calls for still another termination proceeding or whether, in the interest of expediting decision on the child's permanent placement, the termination issue should be resolved as part of the pending adoption proceeding. If we say yes to consolidation at this point, then ironically the prevailing party, the foster mother V.V., will be required to submit to the remedy desired by the losing party, the natural mother T.S., who has sought to escape termination of her rights at this stage by arguing forcefully that all issues should be decided in the adoption proceeding.

When there are competing petitions for adoption, there is a complex, unresolved question whether the child's noncustodial mother, whose parental rights have not been terminated, can dictate the result by consenting to adoption by one of the parties but not the other. Appellant V.V. fears that the answer may be yes—that consolidation of the termination and adoption cases may favor the grandparents because the mother's consent to their adoption of the child, pursuant to D.C.Code § 16–304 (1989), could trump V.V.'s interest in adopting the child. V.V. accordingly seeks termination here as a way of negating T.S.'s legal capacity to consent before the adoption petitions are heard.

We agree that a termination court is not without authority to terminate parental rights even though a separate adoption proceeding as to the same child may be pending, see *supra* note 20; but this is not to say that the child's best interest, which is the ultimate test under both statutes, will always be served by such a two-step—termination-adoption—approach. Indeed, unless convincing reasons for separate proceedings are offered, one could argue as a matter of virtually self-evident common

sense that all termination and adoption issues should be considered by one judge in the same proceeding, where all interested parties are present and can be subject to scrutiny at the same time, subject to sequencing of issues and related evidence in the court's sound discretion. Furthermore, we see no valid reason why one party seeking custody of a child should have an advantage over another party simply because one of two related proceedings goes forward before the other. In light of the fact that both termination and adoption proceedings for D.S. are pending, therefore, the threshold question is whether any valid purpose will be served at this point by keeping these proceedings separate.

To put the issue in context, we believe it will be useful to show why termination and adoption proceedings often proceed separately. Not long ago, the Council of the District of Columbia amended the law to permit termination of parental rights even though no adoption petition was pending. *See Appeal of H.R.*, 581 A.2d at 1156 (discussing history of 1977 law, *supra* note 13). Such termination may be deemed desirable when a child's prospects for adoption are more than marginal and DHS wants to relieve any uncertainty about whether the child will be freed for adoption. *See* COUNCIL REPORT at 6 ("the sooner a child is freed for purposes of an adoptive placement, the sooner he or she will finally obtain an environment of permanence and continuity of relationships."); *A.W.*, 569 A.2d at 172–73. This court has also recognized the Council's view that a separate termination proceeding may be desirable even when an adoption petition has been filed and the prospective adoptive parent does not want to confront the natural parent. "The overarching goal of the [termination statute] was to create as hospitable an environment as possible for potential adoptive parents of neglected children," *id.*, by avoiding "a confrontation between natural parents and prospective adoptive

(1989); *In re K.A.*, 484 A.2d 992, 995–96 (D.C.1984). Thus, the trial court, not the appellate court, always has responsibility in the first instance to find the facts and rule using the statutory criteria properly.

parents." *In re C.A.P.*, 356 A.2d 335, 338 (D.C.1976).[26]

■ In this case, counsel for the mother, T.S., asked for consolidation of the neglect/termination and adoption proceedings, but the Family Division denied the motion after counsel for the foster mother, V.V., argued that V.V. should not have to confront both the hostile mother and the grandparents in the same adoption proceeding. This argument made sense at the time because the termination proceeding involved only T.S. and D.S.'s guardian *ad litem*. Once V.V. intervened in the termination proceeding, however, and T.S. consented to her own parents' adoption of D.S., the interests of the parties to the two proceedings had become so intertwined that consolidation was indicated—although at this point no party moved for it.[27]

Because appellant V.V. so vigorously resisted consolidation of the two proceedings (while T.S. just as vigorously pushed for it), it is important to explore the implications of consolidation—especially burden of proof issues—before ruling definitively on whether the proceedings should be consolidated on remand. We have held that, in an adoption contest between two nonparents—a noncustodial grandparent and a custodial foster mother—the court properly ruled by reference to a preponderance of the evidence in granting the adoption in favor of the grandparent, in the best interest of the child. *See D.I.S.*, 494 A.2d at 1326. We rejected a clear-and-convincing evidence burden of proof. We noted that "when a preponderance of the evidence establishes that adoption by a non-custodial non-parent is in the best interests of the child, the child would remain in the custody of the custodial non-parent when the evidence is less than clear and convincing"—a result that would have been "particularly inappropriate" because the only living natural parent had consented to adoption by the noncustodial grandparent. *Id.*

We have also held, however, that when a noncustodial parent withholds consent to adoption, the trial court, as a matter of constitutional due process, may not order an adoption unless the court finds by clear and convincing evidence that the parent withheld consent contrary to the child's best interest. *See In re D.R.M.*, 570 A.2d 796 (D.C.1990); *In re P.G.*, 452 A.2d 1183, 1185 (D.C.1982); *In re J.S.R.*, 374 A.2d 860, 864 (D.C.1977). Appellant V.V. accordingly is concerned that, unless T.S.'s parental rights are terminated before the adoption petitions are heard, she will not play on a level playing field, so to speak, in the adoption proceeding; she foresees having to establish her claim to adoption by clear and convincing evidence while the noncustodial grandparents will only have to prove their suitability by a preponderance of the evidence.

---

**26.** "[T]he prospective adoptive parents of a neglected child currently must assume an active adversary role with the child's parents. Not only is it undesirable to have to rely on this as the only method of freeing children for adoption, but it also does not work ...", Council Report at 8; *see also* W. Mlyniec and J. Copacino, Juvenile Law and Practice in the District of Columbia 6–3 (1988) ("Counsel should file the motion to terminate the parent-child relationship when adoptive parents do not presently exist. Counsel should also file the motion to terminate when prospective adoptive parents are reluctant to confront the birth parents in an adoption proceeding").

**27.** The Family Division has specific authority to consolidate one Family Division matter with another Family Division matter under Super.Ct.Neg.R. 3(b), which provides:

The Division may, upon ... motion of any party or upon its own motion, consolidate a petition with other causes before the Division relating to members of the same family or household.

*See also* Super.Ct.Civ.R. 42(a). We have held that the decision to terminate parental rights may be joined with an adoption proceeding: [P]ermanent termination of parental rights in an adoption proceeding does not violate the substantive or procedural due process rights of the natural parent when the court finds by clear and convincing evidence that the adoption is in the best interest of the child despite the parents' refusal to consent. *In re D.R.M.*, 570 A.2d 796, 805 (D.C.1990) (citing *In re P.G.*, 452 A.2d 1183, 1184–85 (D.C.1982); *Matter of Adoption of J.S.R.*, 374 A.2d 860, 863–64 (D.C.1977)). An order denying a motion for consolidation is an interlocutory order that is not appealable. *See* 5 Moore's Federal Practice ¶ 42.02[5] (1991).

It is not at all clear what should happen when a noncustodial parent withholds consent to adoption by one party but gives consent to another. Contrary to V.V.'s apparent assumption, however, we cannot say—absent further briefing and argument—that in a consolidated termination-adoption proceeding the court lacks discretion to consider the termination issue first, apart from the adoption decision. But even if, as V.V. supposes, the party who does not receive the mother's consent must prove by clear and convincing evidence that such consent is unreasonably withheld, in the best interest of the child, when that party seeks to adopt, this does not strike us as an inappropriate burden. We so conclude because that party would have to bear such a burden in any event if she were simply seeking to adopt, over the mother's objection, without confronting a competing petitioner. See D.R.M.; P.G.; J.S.R. If a party can carry that burden, then the level playing field will be available vis-a-vis a competing petitioner, and the party who eventually is permitted to adopt will have to prevail by a preponderance of the evidence.

Inherent in this analysis, of course, is an assumption that, in the case of these particular competing petitions for adoption, the noncustodial mother's consent to one (the E.s) but not the other (V.V.) is not conclusive—an assumption based (1) on the facts in D.I.S., where consent itself was not determinative but the consent issue, as such, was not addressed, and (2) on the fact that the child's guardian ad litem in this case supported termination of parental rights in favor of custody by the party (V.V.) on whose behalf the mother herself did not give consent to adoption.

▪▪▪ We shall not explore these issues further, for we are satisfied that V.V. has not made a case for settling the termination issue apart from the adoption proceeding. In the first place, by intervening in this termination proceeding, V.V. has shown her willingness to confront the natural mother; thus, the only reason justifying separate termination and adoption proceedings in this case no longer is applicable. See In re C.A.P., 356 A.2d at 338; supra note 27. Second, the guardian ad litem, not V.V., has represented the child, D.S., in this proceeding but has elected not to appeal; thus, we have learned of no interest of the child—in contrast with V.V.'s interest—that would indicate this termination proceeding should continue separately.

Accordingly, the only reason we can divine for keeping the two proceedings separate is V.V.'s interest in removing T.S. from the equation by the time the adoption petitions are heard. The child's best interest will not be served by continuing such bifurcated treatment.

## IV.

Accordingly, we reverse and remand this case for consolidation with the pending adoption proceeding concerning D.S. and for further proceedings consistent with this opinion.

*So ordered.*

SCHWELB, Associate Judge, concurring in the judgment:

By holding, correctly in my view, that the guardian's petition for termination of parental rights (TPR) should have been consolidated and tried together with the grandparents' petition for adoption, the majority has mooted the question whether certain issues relating to the grandparents[1] were correctly addressed or resolved when the trial court was proceeding on the TPR case alone. It is undisputed that the rights and qualifications of the grandparents will be properly before the court in the consolidated proceedings on remand. The question whether or not the trial judge, in the artificially isolated context of a TPR petition which was not joined with a related pending adoption proceeding, accorded too much weight to the concerns of the grandparents is now a purely academic one which will not affect the result of this case. Familiar notions of judicial restraint should counsel us not to expound upon issues which we do not have to reach. See Smith

1. Actually, the child's maternal grandmother and her husband.

*v. Smith,* 310 A.2d 229, 231 (D.C.1991) (an issue is justiciable only "when the parties' rights may be immediately affected by ... a judicial decision [resolving it]."

Moreover, trial judges can be expected in the future to order consolidation in situations of this kind. The questions to which my colleagues have devoted so much attention are therefore not only moot as to the parties before us, but also unlikely to arise again with respect to other litigants.

Since the majority has nevertheless chosen to address what I regard as moot issues, I too will put in my two cents' worth. The purpose of the TPR proceeding was to render the child adoptable, and it makes little sense to me to decide the TPR case in splendid isolation from its practical consequences in terms of adoption. *See, e.g., In re A.B.E.,* 564 A.2d 751, 756–57 (D.C.1989). If the same situation were to arise again, I would hope that a resourceful trial judge would do whatever he or she could to bring the adoption issue out of the shadows of pending future litigation into the sunlight of immediate plenary consideration, so that a decision so critical to the child's future would not have to be made on the basis of only some of the facts.

But even if the judge were precluded, by the law of the case or other compelling reasons, from ordering consolidation, the paramount consideration, as my colleagues recognize, would remain the best interest of the child. In order to ascertain where that best interest lies, the decision-maker must be apprised of the "entire mosaic." *In re O.L.,* 584 A.2d 1230, 1233 (D.C.1990); *In re S.K.,* 564 A.2d 1382, 1389 (D.C.1989). Specifically, the judge should have broad discretion to consider any evidence which may shed light on the question whether the termination of the mother's parental rights will be in her daughter's best interest, long-term as well as immediate.

If the grandparents have or may have an important role to play in their grandchild's life, then their potential contribution must necessarily become a part of the judge's calculus. To read our TPR statute, *see* D.C.Code § 16–2353(b) (1989), or even general language in the Constitution, *see Ap-*

*peal of H.R.,* 581 A.2d 1141, 1159–66 (D.C.1990) (concurring opinion), as placing doctrinal limitations on the exercise in the child's interest of the judge's discretion, seems to me to be in derogation of the beneficent legislative purpose. In the absence of plain statutory or constitutional language which compels us to do so, we should not inhibit the trial judge, acting as *parens patriae* and as the child's protector, from considering any relevant information which may illuminate the practical consequences of the momentous decision he is called upon to make.

The stakes in this case are high. They embrace no less than the future of a little girl. The judge's ultimate decision will have a profound effect on her life. While I cannot agree with every word the trial judge wrote or omitted, I think that his basic approach—to consider *all* of the practical ramifications of his decision—was the right one. Neither the Constitution nor our protective legislation should be read as impairing the judge's authority to learn all that he can and do all that he can to protect his young ward.